NCAS REALTY MANAGEMENT CORP., Plaintiff–Appellee,

v.

The NATIONAL CORPORATION FOR HOUSING PARTNERSHIPS and The National Housing Partnership, Defendants–Appellants.

Docket No. 97–7326.

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 1997.

Decided April 28, 1998.

Rodney F. Page, Washington, DC (David N. Wynn, Mark P. Monack, Arent Fox Kintner Plotkin & Kahn, New York City and Washington, DC, of counsel, on brief), for Defendants–Appellants.

Stephen E. Powers, New York City (Warshaw Burstein Cohen Schlesinger & Kuh, LLP, New York City, of counsel), for Plaintiff–Appellee.

Before: WINTER, Chief Judge, CARDAMONE, Circuit Judge, and POLLACK*, District Judge.

CARDAMONE, Circuit Judge:

The subject of this appeal is the relationship between the general partners of two housing projects in New York City. Plaintiff is the local managing partner while defendants are supervisory partners who, based in Washington, D.C., were not on the scene. Defendants ask us to reverse a judgment of the United States District Court for the Southern District of New York (Smith, M.J.), entered February 20, 1997, that dismissed the entire lawsuit between these parties, including not only plaintiff's complaint but also defendants' counterclaims. The thrust of those counterclaims, governed by New York law in this diversity action, is a demand for an accounting arising from evidence of plaintiff's self-dealing and for removal of plaintiff as local managing partner.

A partner, as a fiduciary, is held to higher standards than those of the marketplace. "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Car-

---

* Hon. Milton Pollack, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

dozo, C.J.). Because opportunities to profit fall especially into the path of a managing partner, a heavier duty is imposed on plaintiff who acted here not simply as a co-general partner with defendants, but also as the local manager of the partnership projects. Plaintiff failed to honor the rule obtaining between partners—that of undivided loyalty. Accordingly, we reverse the judgment appealed from, and remand this case to the magistrate court with directions that it grant defendants the relief they seek.

## BACKGROUND

Although neither party disputes the magistrate judge's findings of fact, we review those facts to give the reader an understanding of the nature of the relationship between plaintiff and defendants. Plaintiff NCAS Realty Management Corp. (NCAS) is a New York corporation that develops housing for low— to moderate—income families under the federal "Section 8" housing program. Defendants are the National Housing Partnership, a Washington, D.C. partnership organized pursuant to 42 U.S.C. § 3931 *et seq.* for the purpose of encouraging maximum participation by private investors in programs providing low— to moderate—income housing, and the National Corporation for Housing Partnerships, another Washington, D.C. corporation and the sole general partner of the National Housing Partnership (collectively the National Partnership or defendants).

NCAS and the National Partnership entered into two limited partnership agreements as co-general partners. One, for Academy Gardens Associates (Academy) signed on November 27, 1979, governs the operation of a housing project in the Bronx, New York. The other, for Buckingham Hall Associates (Buckingham), was signed a year later on November 26, 1980 and relates to property in Brooklyn, New York. Both agreements provide that NCAS would be the local general partner, responsible for the day-to-day operations of the housing projects. The National Partnership acted as the supervisory managing agent. Since both projects received federal grant funds and subsidies, the management of the properties was regulated by the United States Department of Housing and Urban Development (HUD).

### A. *Partnership Books and Records*

For over a decade, both these partnerships functioned without major incident, but then problems surfaced that ultimately led to this litigation. Relations began to sour in August 1994 when the National Partnership thought the quality of management and financial reporting for the Academy and Buckingham projects was unsatisfactory. Although the partnerships at that time employed the accounting services of J.H. Cohn & Company, the National Partnership decided to engage the accounting firm of Deloitte & Touche, L.L.P. (Deloitte) to audit the projects' 1993 books and records.

On August 24, 1994 Deloitte reported that in its opinion, plaintiff had calculated its management fee in violation of HUD regulations, used identity-of-interest firms without authorization, and neglected to include in the records all HUD-required financial statements and schedules. The National Partnership thereafter named Deloitte as the new auditor for both housing projects, asserting authority to do so under § 5.08(b) in each partnership agreement. It notified plaintiff of this change by letter dated October 28, 1994. The magistrate judge found that plaintiff made no timely objection pursuant to the terms of the partnership agreements.

When defendants made a further request to review the books and records of the partnerships, plaintiff refused to give defendants access to those records and commenced the instant litigation on January 26, 1995 in state court. After removing plaintiff's suit to the Southern District of New York, defendants filed an order to show cause on March 10, 1995 seeking a temporary restraining order and preliminary injunction that would allow its chosen auditor to review the books and records so that the year-end 1994 financial statements could be prepared. District Court Judge Barrington D. Parker, Jr. held a conference on March 10, at which time plaintiff agreed to permit access to defendants and its representatives. The parties also agreed that Goldenberg, Rosenthal & Friedlander (Goldenberg) would conduct the

year-end audit. When on March 22 plaintiff failed to abide by this agreement and afford defendants access, Judge Parker later issued an injunction granting defendants permanent access to the partnership books and records.

### B. *Use of Identity–of–Interest Companies*

Defendants on March 2, 1995, acting pursuant to § 3.03 of the Academy agreement and § 3.09 of the Buckingham agreement, wrote NCAS and gave notice that they were withdrawing their consent for the use of "affiliated persons" (also referred to as identity-of-interest companies) to provide contract services to the partnerships. An "affiliated person," as defined under the agreements, is one who is a partner, related to a partner, or controls, is controlled by, or under common control with a partner.

The magistrate judge found that plaintiff, as the managing partner, had contracted with the following "affiliated persons": Alpha Plumbing and Heating Corporation; Durable Painting Corporation; Noral Security Systems, Inc.; Paramount Boiler and Sewer Services, Inc.; and NCAS Realty Management (plaintiff negotiated with itself as the managing agent and was paid a management fee to operate the housing developments under the partnership agreements). Although the partnership agreements provided that the partnerships could contract with such entities only if both general partners gave their approval, plaintiff admits it took no steps to comply with these terms after it received defendants' March 2 letter, saying that its failure to act was pursuant to advice of counsel.

### C. *Auditors' Findings*

When Goldenberg issued its final 1994 year-end report, it opined that plaintiff was responsible for "material instances of non-compliance" with HUD regulations. While a number of findings were made, four are relevant to the issues on this appeal.

First, Goldenberg discovered that NCAS caused Academy to overpay Noral Security Systems by $179,493 for hours of work that were never performed. Second, Academy paid $26,045 in interest that Noral Security Systems had accumulated on a sales tax defi-

ciency. Third, both Academy and Buckingham paid plaintiff funds in excess of allowable expenses for management fees, payroll and payroll taxes. Fourth, Buckingham paid plaintiff certain management fees prematurely because they were based on anticipated, as opposed to actual, rent collections. The nature of the Goldenberg report prompted the New York City Housing Development Corporation to initiate its own investigation, which uncovered similar wrongdoings. Plaintiff does not deny that it engaged in this questionable conduct. In response to the findings, plaintiff prepared a corrective action plan.

Subsequent to Goldenberg's audit, Deloitte in April 1995 reviewed certain books and records of plaintiff's identity-of-interest companies that had provided services to Academy and Buckingham. The magistrate judge observed that the type of review Deloitte performed was more detailed than the scope of an audit involving financial statements, because Deloitte focused on books, records and source documentation. In addition, the trial court found the resulting report was prepared in good faith and in accordance with generally accepted accounting principles, as well as with HUD regulations.

Listed below are Deloitte's findings with respect to Academy's funds, which we set forth in full because they are critical to resolving the issues raised before us. Some mirror those set forth in the Goldenberg report.

1) Academy overpaid Noral Security Systems for hours of work that were never performed. For the years 1991, 1993, and 1994, the amount totalled $265,724.

2) Academy funds were used to pay the interest that had accumulated on Noral Security System's sales tax deficiency, in the amount of $26,045.

3) Academy paid improper bonuses to employees of Noral Security Systems, NCAS (as management agent), and other non-partnership employees.

4) NCAS improperly calculated its management fee.

5) NCAS deposited partnership funds in its payroll account.

6) NCAS passed to the partnership properties the payroll tax penalties that it owed.

7) NCAS used partnership property funds to pay for professional services for which it was liable.

8) NCAS used partnership property funds to pay for civil penalties that it had incurred.

Plaintiff misused Buckingham property in much the same way, in addition to collecting on its management fee a total of $12,000 more than it was entitled to and causing Buckingham to make a double payment to Durable Painting Corporation. On a final note, Deloitte concluded that the partnerships were overcharged for services provided by Noral Security Systems, Durable Painting, and Alpha Plumbing and Heating.

### D. *Prior Legal Proceedings*

In its original and amended complaints in state court, plaintiff claimed that defendants had committed both breach and anticipatory breach of the partnership agreements, along with breach of fiduciary duty. After they moved the case to federal court on diversity grounds, defendants filed their first answer with counterclaims on March 12, 1995, seeking to remove plaintiff as local general partner. Once the Goldenberg and Deloitte reports were available, defendants filed supplemental counterclaims on June 16, 1995, pursuant to a court order. Bolstered by the accountants' audits, defendants sought an accounting in addition to the removal of NCAS as local general partner.

On October 2, 1995 the case was transferred to Magistrate Judge Lisa M. Smith, who held a bench trial between November 29 and December 5, 1995. The magistrate court issued its decision on February 11, 1997. With respect to plaintiff's complaint, it found defendants had neither breached the partnership agreements nor violated New York Partnership Law, and therefore denied plaintiff any form of relief. At the same time, the magistrate court also denied defendants any relief because, it reasoned, any wrongdoing by plaintiff did not rise to the level of a material breach of the partnership agreements or a breach of fiduciary duty.

Defendants appealed. Since plaintiff did not cross-appeal, we need deal in the discussion that follows simply with those allegations raised in defendants' counterclaims.

### DISCUSSION

#### I Applicable Law

As this case was heard in federal court pursuant to diversity jurisdiction, and New York is the forum state, we look to New York choice of law rules to interpret the partnership agreements. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir.1991). Neither side contests the district court's decision which, after applying New York's "interest analysis" test set forth in *Passalacqua Builders,* concluded that New York substantive law governs the resolution of the issues.

#### II Defendants' Right to an Accounting

##### A. *Standard of Review*

█ Although the district court's findings of fact are not in dispute, the application of those facts to draw conclusions of law is subject to *de novo* review. *See FDIC v. Providence College,* 115 F.3d 136, 140 (2d Cir.1997). Whether a general partner is entitled to an accounting is a conclusion of law involving the application of two New York statutes. The magistrate court did not refer to this relevant statutory authority, but instead summarily decided that because plaintiff neither materially breached the partnership agreement nor breached its fiduciary duty, no accounting was necessary. Reviewing the issue ourselves, we come to the opposite conclusion.

##### B. *New York Partnership Law*

█ Under Article 8 of New York Partnership Law, which governs limited partnerships, a general partner of a limited partnership "shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners." N.Y. Partnership Law § 98(1) (McKinney 1988). The National

Partnership defendants, therefore, are entitled to an accounting as provided for general partnerships under New York law. That law provides four circumstances where a partner has a right to an accounting of partnership affairs. One circumstance is simply "[a]s provided by section forty-three," N.Y. Partnership Law § 44(3) (McKinney 1988), which in pertinent part states

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the .partnership or from any use by him of its property.

N.Y. Partnership Law § 43(1) (McKinney 1988).

Defendants seek an accounting in their amended counterclaim for breach of fiduciary duty within the meaning of § 3.02(b) of the Academy and Buckingham partnership agreements. Section 3.02(b) requires the general partners to "exercise their responsibilities in a fiduciary capacity." Since the just-cited § 43 is entitled "Partner accountable as a fiduciary," it plainly applies in this case and would be an appropriate starting point for determining whether the National Partnership is entitled to an accounting.

### C. *Application of New York Partnership Law § 43*

Defendants seek an accounting based on plaintiff's dealings with its identity-of-interest companies. To establish breach of fiduciary duty under Partnership Law § 43, defendants must show that NCAS benefitted from the dealings in question and lacked the consent to enter into such dealings. Accordingly, defendants allege that plaintiff: (1) made contracts with identity-of-interest companies that were not "reasonably competitive"; (2) caused the partnerships to contract with identity-of-interest companies and pay for goods and services not provided by such companies; (3) engaged in miscellaneous instances of misconduct; and (4) did not receive the requisite approval for these transactions, which is in violation of § 3.03 of the Academy agreement and § 3.09 of the Buckingham agreement. We first address allega-

tions (1), (2), and (3) in turn, which set forth how NCAS benefitted from its transactions with its "affiliated persons." We defer analysis of allegation (4) for a moment, including it in our discussion of whether NCAS acted without the National Partnership's consent.

### 1. Plaintiff's Benefit from Use of Partnership Property

Defendants assert three alternative theories by which NCAS benefitted from contracting with identity-of-interest companies. Allegation (1) charges plaintiff with agreeing to less than reasonably competitive rates on behalf of the partnerships. The magistrate court ruled that defendants did not establish this claim by a preponderance of the evidence. In reaching this conclusion, the trial court pointed to several examples where plaintiff had engaged in competitive bidding before awarding a contract to one of its own companies. Although the court's ruling runs contrary to the conclusions reached by Deloitte in its 1995 report—which the trial court accepted in its findings of fact—whether we agree with the resolution of this particular issue is irrelevant due to the magistrate's own findings of fact concerning the second and third allegations.

Allegation (2) avers that NCAS contracted with identity-of-interest companies for services never provided to the .partnerships. The magistrate judge concluded as much. For example, the magistrate's. findings expressly include the discovery by Deloitte that plaintiff caused .Academy to overpay Noral Security Systems $265,724 in the years 1991, 1993 and 1994 for services not provided. This overpayment confirms defendants' allegation that the partnerships. were billed and ultimately paid for services never rendered by plaintiff's identity-of-interest companies. Further, her findings reveal that plaintiff caused Buckingham to make a double payment to another of its companies, Durable Painting.

Allegation (3) involves miscellaneous instances of misconduct, which have a common thread of being. in violation of HUD regulations. Such wrongdoings include plaintiff using partnership funds to pay: $26,045 in accrued sales tax interest by Noral Security

Systems; bonuses to Noral Security Systems employees; itself an improperly calculated management fee; its own payroll account; payroll tax penalties incurred by NCAS in its own right; professional services that plaintiff should have paid out of its own business accounts; and civil penalties that it incurred separate and apart from partnership business.

Each of these findings illustrates that plaintiff benefitted financially at the expense of the partnerships. As defined in both partnership agreements, an identity-of-interest company is intimately related to at least one of the general partners—in this case, the plaintiff. As proof of this intimate relationship, one of the shareholders and officers of NCAS testified during cross-examination that he is an owner, officer and employee of both Noral Security Systems and Durable Painting. He also is the sole owner of Alpha Plumbing and Heating. All of these companies operate their businesses out of the same office as NCAS. Such a close relationship between the identity-of-interest companies at issue and plaintiff strongly supports the conclusion that the payments just listed benefitted NCAS.

Defendants' proof on allegations (2) and (3) therefore established the first part of their fiduciary duty claim, namely that plaintiff enjoyed a benefit from "transaction[s] connected with the ... conduct ... of the partnership or from any use ... of its property." N.Y. Partnership Law § 43(1). Such conduct constitutes a breach of fiduciary duty, however, only if plaintiff acted without the consent of the National Partnership. *See id.* Discussion now passes to allegation (4), that plaintiff's conduct breached those sections of the partnership agreements requiring defendants' consent for contracts with identity-of-interest companies.

### 2. Plaintiff's Breach of the Consent Provisions

Section 3.03 of the Academy agreement states that "any transaction by the Partnership with Affiliated Persons shall be subject to [defendants'] and the Local General Partner's approval." Section 3.09 of the Buckingham agreement includes substantially similar

language. As noted earlier, on March 2, 1995 National Partnership wrote plaintiff that it was withdrawing its consent to use "affiliated persons" for contract services, and specifically withdrew consent for contracts with Noral Security Systems, Durable Painting, and Alpha Plumbing and Heating. Plaintiff admits it ignored this letter and instead continued to contract with these companies. Hence, transactions subsequent to the date of the letter not only quite plainly benefitted NCAS and its identity-of-interest companies, but also were done without defendants' consent. In breaching the partnership agreements, plaintiff thereby violated its fiduciary duty to defendants, as that duty is defined in § 43 of the New York Partnership Law.

With respect to transactions pre-dating the March 2 letter, plaintiff raises two defenses as to why those transactions should not form the basis for granting defendants an accounting. First, it insists that because defendants approved all prior contracts with identity-of-interest companies, they thereby approved all practices related to those contracts. It cites *Gutwirth v. Carewell Trading Corp.*, 12 A.D.2d 920, 920, 211 N.Y.S.2d 732 (1st Dept.1961), for this proposition. In that case, the court denied an accounting to a partner because "there was no diversion of funds on the part of defendants, and ... plaintiff had full knowledge of and consented to all of the acts of which he now complains." Yet *Gutwirth* is distinguishable from the case at hand.

The partners in *Gutwirth* were not guilty of wrongdoing, while here the trial court found that plaintiff engaged in improper transactions involving partnership funds. Moreover, any consent given by the National Partnership prior to March 2, 1995 was consent only for what it believed were legitimate transactions. Defendants lacked knowledge of plaintiff's improper use of partnership funds until after Deloitte conducted its review of the identity-of-interest companies' books and records in the spring of 1995. In fact, the trial court itself found that

[T]he level of detail in the financial statements and budgets prepared by the partnerships did not enable defendant ... to

evaluate whether the partnerships properly accounted for items such as its management fee, bonuses, and charitable contributions, whether excess payments had been made, and whether services being obtained for the partnerships were competitively bid.

Without having either actual or constructive knowledge of the entire scope of plaintiff's use of partnership funds involving identity-of-interest companies—or any means by which to discover it—defendants' approval of past contracts cannot now be considered the equivalent of "full knowledge" as that phrase is used in *Gutwirth.*

■ The second defense plaintiff raises is that the remedy of an accounting is unavailable to defendants because the equitable doctrine of "unclean hands" applies. This argument is frivolous. New York courts have held that one partner's misconduct does not automatically deprive him of the right to an accounting. *See Dwyer v. Nicholson,* 109 A.D.2d 862, 863, 487 N.Y.S.2d 56 (2d Dept. 1985) ("[A]llegations of [a partner's] unclean hands will not relieve [the other partners] of their duty to account."); *Bell v. Herzog,* 39 A.D.2d 813, 814, 332 N.Y.S.2d 501 (3d Dept. 1972) ("[T]he misconduct of a partner does not necessarily deprive him of his right to demand an accounting."). Moreover, the magistrate court found that the National Partnership engaged in no misconduct, hence the unclean hands doctrine had no application here.

■ Looking simply at the trial court's findings of facts reveals that plaintiff violated its fiduciary duty under Partnership Law § 43. As a consequence, defendants are entitled to an accounting with respect to *all* transactions, contracts and dealings, regardless of when entered into, between Academy and Buckingham, plaintiff, and any identity-of-interest companies.

## III  Defendants' Request to Remove Plaintiff As Local General Partner

### A.  *Standard of Review*

■ One means by which National Partnership has the authority to remove NCAS as local general partner is via the terms of the partnership agreements. Since the facts are not in dispute, our review is limited to the magistrate judge's legal interpretation of those agreements. The construction of the text of an agreement is reviewed *de novo. See Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.,* 903 F.2d 910, 912 (2d Cir.1990).

The trial court withheld authorization to remove NCAS as local general partner because it found plaintiff's misconduct was neither a "material breach" of the partnership agreements nor a breach of fiduciary duty as that duty is defined in those agreements. We reach a different conclusion, believing that NCAS's actions are grounds for its removal under the terms of the partnership agreements.

### B.  *Terms of the Agreements as Controlling Authority*

■ Under New York law, "[t]he rights and obligations of the partners as between themselves arise from, and are fixed by, their agreement." *Corr v. Hoffman,* 256 N.Y. 254, 272, 176 N.E. 383 (1931). When a partnership agreement contains clear and unambiguous terms, New York courts enforce the plain meaning of those terms, without resorting to extrinsic aids of interpretation, *see CCG Assocs. I v. Riverside Assocs.,* 157 A.D.2d 435, 440, 556 N.Y.S.2d 859 (1st Dept. 1990), or rewriting those terms. *See Curtin v. Glazier,* 94 A.D.2d 434, 438, 464 N.Y.S.2d 899 (4th Dept.1983) (noting that a complete expression of the parties' intention set forth in writing may not be rewritten); *CCG Assocs. I,* 157 A.D.2d at 440, 556 N.Y.S.2d 859. Further, when a partnership agreement expressly provides terms for removal, the partners' purposes should not be frustrated, absent evidence of overreaching or some other violation of public policy. *See Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977). The parties have no quarrel with the policy underlying the agreements, the terms of which the magistrate court found "clear and unambiguous," in conformance with state law, and which it further stated would be enforced according to their "plain meaning."

Defendants' third and fourth counter-claims, which seek removal of NCAS as local general partner, fault plaintiff for committing a "material breach *within the meaning of Section 8.08* of the Partnership Agreements." (emphasis added). Section 8.08 is virtually identical in both agreements and reads, in pertinent part

> Any one or more of the following shall be grounds for the removal of the Local General Partner:
>
> (i) violation of or failure to comply with a *material provision* of the Purchase Agreement, this Amended and Restated Limited Partnership Agreement ..., the Regulatory Agreement or any law or regu-lation applicable to the Project.

(emphasis added). Clearly then, if plaintiff is in noncompliance with a "material provision" of the partnership agreements, or any appli-cable law or regulation, this section empow-ers defendants to demand plaintiff's removal as local general partner.

### C. Plaintiff's Breach of a "Material Provision"

■ Turning first to defendants' fourth counterclaim, the National Partnership alleg-es that NCAS acted in violation of § 3.03 of the Academy agreement and § 3.09 of the Buckingham agreement by contracting with its identity-of-interest companies after de-fendants withdrew their consent in their March 2, 1995 letter. As noted earlier, those sections of the agreements require de-fendants' approval over all contracts involv-ing "affiliated persons." The magistrate judge found plaintiff had violated these sec-tions when it maintained those contracts af-ter defendants' consent was rescinded. Even NCAS admits its continued employ-ment of these companies after receiving the letter, pursuant to advice of counsel. Yet nothing in the language of the agreements permits a partner to act unilaterally in the event of litigation or upon advice of counsel. And, under New York law, a court may not read into the unambiguous language of § 8.08 any additional requirements. Having established that plaintiff is in breach of its agreements with defendants, the question then becomes whether this breach is of a

"material provision" within those agree-ments.

Nothing in the agreements defines what constitutes a "material provision." Consider-ing however that the language requiring de-fendants' approval for contracts involving identity-of-interest companies is enumerated within the relevant sections—the only ones in the agreements to address business relations with "affiliated persons"—we hold that ap-proval of contracts is a material provision. Accordingly, plaintiff's actions in continuing to deal with identity-of-interest companies violated a material provision of the partner-ship agreements. Thus, the National Part-nership has the right to remove NCAS as local general partner.

The trial court's discussion took a different path from ours because it focused on the phrase "material breach" in a different con-text than that used in defendants' counter-claims. It required the breach itself to be material, instead of enquiring whether the breach was of a material provision. Yet, as quoted earlier, § 8.08 of the partnership agreements clearly states that *any* violation of a material provision is grounds for remov-al. New York law requires courts to enforce such an unambiguous term as written.

We are also not persuaded to follow the magistrate judge's analysis because it relied upon cases involving contracts negotiated at arm's-length, not partnership agreements. *See Lanvin Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 195 (S.D.N.Y.1990) (involving licensing agreement to sell perfumes); *Miller v. Ben-jamin*, 142 N.Y. 613, 617, 37 N.E. 631 (1894) (involving contract to sell slit steel). New York case law makes it evident that partners are held to a higher standard in their deal-ings with one another than parties involved in an ordinary garden-variety contract. As Chief Judge Cardozo announced

> Joint adventurers, like copartners, owe to one another, while the enterprise contin-ues, the duty of the finest loyalty. Many forms of conduct permissible in a worka-day world for those acting at arm's length, are forbidden to those bound by fiduciary ties.

*Meinhard*, 249 N.Y. at 463–64, 164 N.E. 545. We find no authority that would permit the

application of "material breach" contract principles to the express terms of NCAS's and the National Partnership's limited partnership agreements and thereby overcome application of the *Meinhard* standard in the instant case.

Having found that the National Partnership succeeds in its fourth counterclaim because NCAS breached a material provision of the partnership agreements by contracting with identity-of-interest companies absent defendants' consent, we need not reach defendants' other claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the matter is remanded to the magistrate court with directions that it grant defendants an accounting and remove plaintiff as local general partner, consistent with this opinion.

Reversed and remanded.