**J. Daniel LUGOSCH, III; Robert L. Ungerer; John A. Bersani; Edward A. Kellogg; John C. Charters; Peter C. Steingraber; Richard K. Askin and William Tapella, Plaintiffs,**

v.

**Robert J. CONGEL, individually and as General Partner of Woodchuck Hill Associates, Riesling Associates, Madeira Associates and Moselle Associates; Pyramid Company of Onondaga; Eklecco L.L.C.; Woodchuck Hill Associates; Riesling Associates; Madeira Associates; Moselle Associates; James A. Tuozzolo; Robert Brvenik; Marc A. Malfitano; and Scott R. Congel, Defendants.**

No. 1:00–CV–0784.

United States District Court,
N.D. New York.

Dec. 16, 2003.

Daniel J. French, Green, Seifter Law Firm, Syracuse, NY, Donald T. Kinsella, Green, Seifter Law Firm, Jeffrey S. Shelly, Michael I. Endler, Boies, Schiller Law Firm, Albany, NY, for Plaintiffs.

David J. Hensler, Lisa Bonnano, Hogan, Hartson Law Firm, John M. Bray, Michael J. Ciatti, David R. Weiser, King, Spalding Law Firm, James P. Gillespie, Jeffrey Adam Rosen, Laura Rebecca Bach, Kirkland, Ellis Law Firm, Gordon A. Coffee, Krista M. Enns, Winston, Strawn Law Firm, Washington, DC, Michael J. Cunningham, Iseman, Cunningham Law Firm, Albany, NY, Nancy L. Pontius, Stephen T. Helmer, Mackenzie, Hughes Law Firm, Edward Gerald Melvin, Costello, Cooney Law Firm, Robert J. Smith, Costello, Cooney & Fearon, PLLC, Syracuse, NY, Anthony S. Fiotto, Christopher David Moore, Paul F. Ware, Jr., Goodwin, Procter Law Firm, Kai W. Lyman, Goodwin, Proctor Law Firm, Boston, MA, Patricia A. Griffin, King, Spalding Law Firm, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER

TREECE, United States Magistrate Judge.

### I. INTRODUCTION

It was truly wishful thinking on the Court's part that this litigation's discovery would end with a whimper rather than a bang. Those wishes will not be fulfilled and, yet, it was not totally unexpected that as discovery concludes the Court would have to confront a treasure trove of outstanding discovery disagreements. Such has been the nature of this litigation and to think otherwise was truly polyanna.

The Plaintiffs make a Motion to Compel Discovery of so many documents, and for so many reasons, that, if disclosed in hard copy form, would fill a garrison. Defendants, fighting tooth and nail to the end, have no intention of willingly disclosing this fountain of documents.

The *sine qua non* of our discovery battle de jure rests on Defendants' Joint Defense Agreement which includes within its purported shelter the non-party Pyramid Mall Group, Inc. (PMG), the managing company of all of the Pyramid Malls, and another non-party to this litigation, PCK Development Company. As the managing company for all of the Malls, PMG has the unique and peculiar advantage of possessing all of the documents relative to the management of each of the Malls, and in many respects, over the course of this litigation has made these docu-

ments privy to only those who fall under this Joint Defense Agreement's umbrella.

The Defendants and PMG have become a team and jointly invoke the attorney-client privilege and work product doctrine to defeat Plaintiffs' clamor for these reams of documents. Plaintiffs, who are or were partners in some of the Pyramid Malls, cry foul in that some of the partners, who are also Defendants, have carte blanche access to PMG's records and documents, while other partners, such as themselves, are left out in the blinding cold. Thus, the Plaintiffs resort to a torrent of challenges to pierce the Defense Agreement, more specifically, the twin pillars of the attorney-client privilege and work product doctrine, so that they too may revel in what benefit PMG's records may unfold.

Based upon the following reasons, Plaintiffs' Motion to Compel disclosure is GRANTED in part and DENIED in part.[1]

## II. BACKGROUND

The facts in this case have been stated in great detail in a near dozen or so pre-trial decisions and orders, and thus it would be expected that those facts would be presumed so that brevity could reign and an expedient discourse of the facts in this Memorandum Decision and Order would be in order. It has often been said regarding this litigation

that it is complex and convoluted, and, in terms of its grandiosity and the inordinate volume of documents and issues, there are few peers. In order for us to grasp the facts and issues in this Motion, which includes fiduciary relationships, we must, unfortunately, discuss with particular minutiae the composition of the intertwined and intricate management infrastructure and policies and the roles of key personalities in the Pyramid Mall Consortium. Indeed, an in-depth analysis of the Joint Defense Agreement obviously compels such a lengthy discourse.

### A. Pyramid Mall Infrastructure and Key Players

There have been as many as twenty-three (23) separate malls and related commercial enterprises throughout the Northeast which comprise the Pyramid Mall Consortium, several of which have been sold in recent years. Currently there are nineteen Malls and other commercial centers within the Pyramid Mall Stable.[2] The Malls vary in size however; Crossgates in Albany and Carousel Center in Syracuse would be considered the flagships of this Consortium.

The genesis of this Mall Consortium scheme was in the mid–1970s. Each of these Malls are partnerships independent of each other, although many of the Malls have the same owners. In essence, each partnership

---

1. Speaking of an avalanche of documents to be reviewed, the parties, albeit at the Court's direction pursuant to Orders, dated September 5, 2003 (Dkt. No. 265) and October 21, 2003 (Dkt. No. 287), have filed the following in support of their respective positions on these issues.
 On behalf of the Plaintiffs, the Court will consider the following:
 Dkt. No. 290, Jeffrey S. Shelly, Esq., letter-memorandum, dated September 22, 2003, with Exhibits # 1–17;
 Dkt. No. 291, Jeffrey S. Shelly, Esq., letter, dated September 26, 2003, with Exhibit # [designated] 18;
 Dkt. No. 293, Jeffrey S. Shelly, Esq., letter-memorandum, dated October 10, 2003, with Exhibits # 1–7;
 Dkt. No. 295, Jeffrey S. Shelly, Esq., letter-memorandum, dated October 24, 2003, with Exhibits # 1–4.
 On behalf of the Defendants, the Court will consider the following:
 Dkt. No. 292, David J. Hensler and Anthony Fiotto, Esqs., letter-memorandum, dated September 29, 2003, with Exhibits A–S;

Dkt. No. 294, David J. Hensler and Anthony Fiotto, Esqs., letter-memorandum, dated October 24, 2003, with Exhibits A–M.
 There are certain documents filed under seal pursuant to the Court's October 21, 2003 Order, which will also be considered.
 In addition, Dkt. No. 273, James T. Potter, Esq., (attorney for the non-party PMG), letter-memorandum, dated September 29, 2003, with exhibits A–C.
 Since the crux of the documents being sought are highly sensitive, the Court directed the Defendants, by an Order dated October 28, 2003 (Dkt. No. 296), to provide affidavits and further elaborate on their claims of attorney-client privilege and work product doctrine. Those affidavits and exhibits were timely received under seal.

2. Those malls which have been sold are Crystal Run Plaza (2002), Alpine Commons (1999), Emerald Square (1989), and Silver City Galleria (1995). It remains nebulous, however, whether these Malls' respective holding companies still exist.

is a developer of a specific yet separate real estate venture within a common and unified paradigm we now refer to as the Pyramid Malls. Each of the Malls are replicas of this paradigm and they essentially employ the same operating procedures. Moreover, in most instances, they employ the same managing company, PMG. The Malls' Partnerships own the real property but the day to day management of the Malls is handled by PMG. Dkt. No. 290, Ex. 7 at pp. 141–50 (M. Malfitano Dep.).

This business/partnership model has two essential elements. There is an executive committee which, by all accounts, is the daily decision maker for the respective partnership. Although the respective executive committees are comprised of various personalities, the common denominator on each of these partnerships' executive committee is Robert J. Congel, the primary Defendant in this litigation. And each Mall is a general partnership with the percentage of ownership varying widely.[3] No two partnerships share completely identical ownership, though there are partners who are partners in more than one partnership.

An interesting aspect of Pyramid Malls is the broad spectrum of partners who range from individuals to family trusts to other partnerships. It appears that the partners with the largest ownership interests are themselves partnerships, which may also be comprised of other partnerships and trusts. For example, and generally speaking, four partnerships, who are by the way Defendants in this law suit, have controlling interests in most of the Pyramid Malls: (1) Woodchuck Hill Associates [seven malls]; (2) Madeira Associates [one mall]; (3) Riesling Associates [eight malls]; and Moselle Associates [three malls]. As identified, the common thread running through all of these Malls is Robert J. Congel who is a partner in each of the Malls. Though Congel individually holds nominal ownership interest in many of the Malls, he possesses or possessed controlling interest ("outright") in approximately five of these Malls. Dkt. No. 294, Ex. A.

Yet, if we burrow further into all of these partnerships, and peel off the outward identities of these general partnerships who are general partners with most of these Malls, we discover that they are generally and typically comprised of family trusts established for Robert J. Congel's children. For example, Woodchuck Hill Associates is composed of Valhalla Trust (99%) and Robert Congel (1%). Valhalla Trust was established in 1977 for the benefit of Congel's children. As another example, Madeira Associates, which is the largest partner in the Crossgates Mall, has two general partners, Wotan Trust (99%) and Robert Congel (1%). Again, Wotan Trust is a typical Congel family trust.[4] Dkt. No. 294, Ex. A. It is asserted by Plaintiffs that Congel, individually and through his family partnerships and trusts, owns at least 51% of each partnership. Dkt. No. 269 at ¶ 63, 3rd Am. Compl.

As previously stated, PMG is, or was, the managing company for most of the Pyramid Malls responsible for the day to day management of the Malls. PMG is a New York corporation engaged in the business of leasing, managing, and operating shopping malls, and is a separate legal entity from the Pyramid Malls. Dkt. No. 290, Ex. 9 at ¶¶ 4 & 13 (Malfitano Aff.). As the Mall partnerships developed their respective projects which invariably were shopping malls or commercial centers, they discovered they needed an entity to handle "an ongoing and consistent management function," so they created PMG to serve in this capacity. PMG provides certain "economies of scale, insure[s] quality and provide[s] the best overall economic return to each partnership." *Id.* at ¶¶ 5–7. PMG's relationship with each of the Malls is on a

---

3. The record before the Court does not reflect, with regards to any of the Malls, that any of the partners are limited. Thus, from all accounts, each of the partnerships are general partnerships.

4. Similarly, Riesling Associates is comprised of Kundry Trust (99%), a Congel Family Trust, and Robert Congel, as well as Moselle Associates,

which is a kindred general partnership with two general partners, Fricka Trust, a Congel Family Trust, and Robert Congel. Indeed as you peer closer at some of the other general partners within the Pyramid Mall Consortium, who are partnerships, you may also see either one of these "associates," other parties' family trusts, or other individual partners. Dkt. No. 294, Ex. A.

contractual basis. Dkt. No. 290, Ex. 7 at p. 144.

Vinum Enterprises is the sole shareholder of PMG. *Id.* However, Vinum is owned by Madeira (25%), Congel, and Wotan Trust, and, as we know, Madeira has two general partners, Congel and Wotan Trust. *Id.* at pp. 161–66. PMG has no partnership interest in any of the Malls, though several of its executive officers, such as Robert Congel, President, Marc Malfitano, General Counsel and Primary Manager, and James A. Tuozzolo, Chief Executive Officer, have partnership interests in some of the Malls. *Id.* at pp. 136, 139 & 146; Ex. 9 at ¶¶ 4, 7, & 13; Dkt. No. 294, Exs. A & B.[5]

PMG handles all of the financial affairs of those Malls with which it has entered into a management contract. Supposedly, separate financial books and records are kept for each of the entities, however, most if not all of the transactions or disbursements for all of the Malls are handled through a single cash account ("concentration account"). Dkt. No. 290, Ex. 7 at pp. 141–42 & 162–64.

The relationship between each respective Mall and PMG is governed by a management agreement. Presumably the management agreement is the same for all the Malls managed by PMG. In some instances, there were management agreements, supplemental managements, and related memoranda. *See, e.g.,* Dkt. No. 290, Ex. 1 (Crossgates' Agreement).[6] It is important to summarize several of the more salient aspects of this agreement:

| | |
|---|---|
| Whereas | Owner desires to engage the services of Agent to operate and manage said Shopping Center; |
| ¶ 1 | Employs Agent, as an independent contractor exclusively to rent, lease, operate, and manage the Shopping Center; |
| ¶ 1.a | To use due diligence in the operation and management; |
| ¶ 1.c | To deposit receipts collected for the Owner in a separate account. |
| ¶ 1.f | To employ and supervise all employees; |
| ¶¶ 1.h-l | Pay the utilities, mortgage, taxes, and fulfill Owner's obligation under the leases; |
| ¶ 4 | Nothing herein shall be deemed or construed by the parties hereto nor by any third party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither method of computation of compensation or any other provision shall create any relationship between the parties other than as Owner and Agent, being an independent contractor. |

Dkt. No. 290, Ex. 1.

The supplemental management agreement adds several more management tasks for PMG but reiterates the general nature of the parties' relationship which is set forth in paragraph four (4) above. *Id.*

Because of the stated relationship in paragraph four of the management agreements, there appears to be some bafflement as to PMG's legal relationship with the respective Pyramid Malls. Clearly it is understood that PMG and the Malls would not be considered partners or involved in a joint venture, but the ambiguity lies with whether they are considered an agent to the extent there is a fiduciary relationship with the individual Malls. A reader of the management and supplemental management agreement would be confused by the contract's delineation between "not being in a principal/agent relationship" but rather "being an owner/agent

---

**5.** Marc Malfitano, a Defendant, is a partner in Carousel Center, Poughkeepsie Galleria, Hudson Valley Mall, Independence Mall, Crystal Run Galleria, and Walden Galleria. Another Defendant who makes up PMG's executive team, Robert Tuozzolo, had or has ownerships interest in Walden Galleria, Palisades Center, Crossgates Mall, Hudson Valley Mall, Independence Mall, Berkshire Mall, Crystal Run Galleria, Champlain Centre, Champlain Plaza, and Emerald Square. Moreover, he served or serves on the executive committees, along with Congel, for at least eight (8) Malls. Dkt. No. 294, Exs. A & B. Scott Congel, a Defendant and son of Robert Congel, is PMG's leasing representative, who also plays a major role in the operation of these Malls. *Id.*

**6.** The Court is somewhat bewildered on whether this managing company is a corporation or a partnership. Marc Malfitano, PMG's General Counsel, previously averred in another legal proceeding that PMG is a corporation. Dkt. No. 290, Ex. 9 at ¶ 4. However, the management contract with Pyramid Crossgates Company identifies an apparent partnership, Pyramid Companies (Management Division). Dkt. No. 290, Ex. 1. Adding to the confusion, for example, several of PMG's chief employees are sometimes either referred to as corporate officer (Robert Congel, President) or partner (Bruce A. Kenan, David Nettina). Dkt. No. 294, Ex. B. Confusion notwithstanding, in the scheme of things, whether the managing company is deemed a partnership or a corporation will be of minimal significance in determining whether a fiduciary duty is owed to the owners.

relationship." The Court fails to see the legal distinction, and the management agreements fail to provide an adequate explanation for such distinction. *Id.* at ¶ 4. Under these circumstances, the Court has resorted to the interpretation of PMG's role from its General Counsel, Marc Malfitano, Esq., who has been involved with Pyramid Malls and PMG since the 1980s, for a better understanding of this business relationship. It is Mr. Malfitano's considered opinion that PMG has a fiduciary relationship with each of the Malls and that he has in fact "17 different **masters.**" Dkt. No. 290, Ex. 7 at pp. 149–51.[7] As Malfitano further noted, "PMG must answer to each partnership with whom its [sic] contracts ...." Dkt. No. 290, Ex. 9 at ¶ 7; *see also* ¶¶ 5 & 6.

To further understand the Pyramid Mall interconnected business infrastructure, it is paramount to understand the roles of the key litigants. Without doubt, we all understand that Robert Congel is the hub of this multi-facet, multi-layered business wheel and Woodchuck, Riesling, Madeira, and Moselle Associates are the primary spokes. As noted above, Defendants Tuozzolo and Malfitano have dual roles as critical officers in PMG and partners in several of the Pyramid Malls. *See supra* n. 5. Defendants Robert Brvenik and Scott Congel have been identified as PMG's Chief Financial Officer and Leasing Representative, respectively. Dkt. No. 294, Ex. C. Additionally, Scott Congel is cast as Robert Congel's "second in command." Dkt. No. 269 at ¶ 54, 3rd Am. Compl. And, lastly, each of the Plaintiffs are or were general partners in one or more of the Pyramid Malls. Dkt. No. 294, Ex. A; Dkt. No. 269, 3rd Am. Compl.[8] It further appears that none of the Plaintiffs served as officers in PMG. Dkt. No. 294, Ex. C.

### B. The Litigation

This litigation commenced on or about May 22, 2000. Dkt. No. 1. There have been three amendments to the Complaint and several motions to dismiss causing parties and causes of actions to be added and deleted. The Third Amended Complaint (Dkt. No. 269) was filed with the Clerk of the Court on September 19, 2003, and the discovery deadline, on the heels of expiring, is currently stayed pending this and another Motion to Compel (Dkt. No. 287, Order dated Oct. 21, 2003).

Currently, there are ten (10) causes of action against the various Defendants. The lynchpin of this lawsuit is a Civil RICO cause of action, pursuant to 18 U.S.C. § 1961. In addition, there are nine other

---

**7.** In *In re Pyramid Crossgates Co. v. The Bd. of Assessors of the Town of Guilderland*, Index No. 4043–93, Marc Malfitano testified in part as follows:

> Pursuant to the [Management] Agreement, there is an obligation to act as an agent; and in the legal sense, we are an agent for Pyramid Crossgates to manage the center .... One, there is a fiduciary relationship of accountability in the general sense of, you know, accountability to—relationship to and to accountability for actions. Then, probably on a very practical level, there's the continued, in fact, accountability when the owners come and say, well, what about this matter? .... So, it's an accountability of a moral obligation and there's accountability for day-to-day—for action with respect to Crossgates and each one of these centers .... I have 17 different masters.

Dkt. No. 290, Ex. 7 at 149–51.

And yet, Defendants' attorneys proffer that Malfitano was using fiduciary "in a loose fashion to describe PMG's obligations ... [and][i]n no way was he purporting to represent that PMG met the legal definition of a fiduciary with respect to Crossgates." Dkt. No. 292 at n. 6. This Court respectfully disagrees. *See infra* Part III.D.

**8.** The Plaintiffs have or had ownership in Pyramid Malls as follows:

| | |
|---|---|
| Daniel Lugosch | Crossgates (family trust), Hudson Valley, Independence (no longer), Berkshire (no longer), Emerald Square (sold), Silver City (sold) |
| Robert Ungerer | Holyoke, Hampshire, Walden, Crossgates, Silver City (sold) |
| John Bersani | Independence, Berkshire, Emerald Square (sold) |
| Edward Kellog | Poughkeepsie |
| Richard Askin | Independence |
| William Tapella | Independence |
| Peter Steingraber | Walden, Carousel, Poughkeepsie, Crystal Run Galleria, Crystal Run Plaza (sold), Silver City (sold) |
| John Charters | Independence |

Dkt. No. 294, Ex. A.

Moreover, Robert Ungerer and Daniel Lugosch served on several of the Malls' executive committees. *Id.*

causes of action sounding in: Fraud (Count II), Conversion (Count III), Conspiracy (Count IV), Aiding and Abetting (Count V), Breach of Contract (Count VI), Breach of Fiduciary Duty (Count VII), Breach of Contract as to four Defendants (Count VIII), Breach of Fiduciary Duty as to four Defendants (Count IX), and Constructive Trust (Count X). Dkt. No. 269. We need not regale the reader with the intimate details of Plaintiffs' allegations against the Defendants, but, since this Memorandum Decision and Order will be addressing PMG and the attorney-client privilege and work product doctrine, we will examine the Third–Amended Complaint in this light.

As to the Civil RICO cause of action, PMG is identified as the "criminal enterprise." Dkt. No. 269 at ¶ 162; *see also* ¶¶ 158–85. Five of PMG's principal officers are named as Defendants herein and the RICO cause of action is pled against each of them, namely, Robert Congel (President), Marc Malfitano (General Counsel), James Tuozzolo (Chief Executive Officer), Robert Brevenik (Chief Financial Officer), and Scott Congel (Leasing Representative). *Id.* at ¶ 160. Plaintiffs further allege that Woodchuck, Moselle, Madeira, and Riesling Associates control and manage PMG for their benefit, and are the principal vehicles by which Robert Congel wields control over PMG and the Pyramid Malls. *Id.* at ¶¶ 19–43. There is no cause of action pled against PMG, as the Plaintiffs contend that PMG cannot be a party defendant to this lawsuit because of its designation as a "criminal enterprise." *See infra* Part III.C at pp. 31–33. Yet, references to PMG are replete throughout this fifty-six (56) paged Complaint. Because these references will be key in our discussion below on the attorney-client privilege and work product doctrine, it behooves us to identify some of the more salient allegations levied by the Plaintiffs against PMG in the Complaint.

| Paragraphs | Summary of Content |
| --- | --- |
| 55 | Scott Congel committed various acts and executed numerous documents on behalf of PMG in furtherance of his father's (Robert Congel) scheme. |
| 61 | Associates permitted Congel to use PMG as the enterprise for his fraudulent scheme. |
| 67 | PMG managed Partnership property without necessary consent and was not empowered to use Partnership funds for non-Partnership purposes. |
| 68 | PMG has regularly and intentionally failed to provide financial reports, provided false and misleading financial information, commingled funds, and actively engaged in the conversion of partnership funds for non-Partnership uses. |
| 70 | PMG, through its officers, intentionally, systematically and repeatedly overcharged the Partnerships. |
| 88 | Congel used PMG to drain the Partnerships as an additional source of cash. |
| 100 | Through PMG, Partnerships' accounts have intentionally and continuously "swept" of receipts on a daily basis. |
| 101–04 | PMG used the concentrated account to loan money to PMG and others. There were millions of unauthorized borrowing. |
| 119–24 | PMG used a systematic pattern of overcharging for services provided and has been paid for millions of unauthorized fees. Congel used PMG to pass through his personal expenses. |
| 158–85 | RICO allegations against PMG, the criminal enterprise. PMG played an integral role in mail and wire fraud. Concentration account is a fraud. |

In addition to the Civil RICO cause of action being levied against them, PMG's primary officers, who are Defendants in this case, are defending other charges of fraud, conversion, and conspiracy. *Id.* (Counts II, III, & IV).

### C. The Joint Defense Agreement

The Court is uncertain when the well-knit Pyramid Mall fabric began to fray and unravel and the partners' actions indicated less than unanimity on how the Malls' and PMG's businesses were being conducted. But it appears that discord and rancor became more apparent when, in 1998, Plaintiffs Lugosch, Steingraber, and Bersani hired a private investigative firm, Investigative Group International (IGI), and further demanded PMG to release documents to IGI relative to those Malls in which they were partners. Lisa Bonanno, Esq., Decl., dated Nov. 6, 2003, at ¶ 8 (filed under seal). The motive of such demand is unclear but, ostensibly it could have been to check the accuracy of PMG's financial records as to Plaintiffs' Partnerships.

The demand triggered a reaction with and within PMG and, over the ensuing four years, they sought legal advice internally and from outside law firms. Predominately due to litigators now being involved and Plaintiff Lugosch's letter, dated July 19, 1998, which

caused great alarm among PMG's principal officers and several other Defendants, records were generated and, furthermore, an accounting firm was hired by PMG to conduct an audit of its books. All of these records, including the audit papers, have been referred to as the Lugosch Audit Papers. Defendants claim that the audit papers are cloaked by the attorney-client privilege and the work product doctrine due to PMG's anticipation of litigation. Dkt. No. 292, Ex. M at p. 2. And as previously discussed, a lawsuit was eventually commenced on May 22, 2000.

Prior to this lawsuit, there had been a myriad of lawyers who provided, and still provide, legal services to the Defendants and PMG. Upon the commencement of this lawsuit, or shortly thereafter, the law firms of Hogan & Hartson, and eventually Goodwin & Procter, in addition to other law firms, jointly represented Robert Congel, Woodchuck, Moselle, Riesling, and Madeira Associates. Dkt. No. 294 at ¶¶ 4–5; *see also* Dkt. No. 290, Ex. 16 (lt. discussing an August 2000 letter between attorneys (Hogan & Hartson) and client (PMG)). During the initial discovery phase of this litigation, Hogan & Hartson and Goodwin & Procter provided legal advice to PMG regarding, to a significant extent, the management, collection, and discovery production of relevant documents possessed by PMG. Dkt. No. 292 at pp. 5–6 n.5. In fact most of the relevant financial and daily records of the Pyramid Malls are held by PMG. Plaintiffs served a subpoena on PMG for records which was initially opposed by PMG's General Counsel and later by these two law firms. Dkt. No. 292, Exs. A (subpoena dated July 25, 2000), F (lt. opposing subpoenas on PMG) & N; Dkt. No. 294 at p. 5 & Ex. N. No privileged PMG documents were shared with any Defendant prior to October 16, 2001, other than those who are or were employees of PMG. Dkt. No. 292 at

p. 4; Dkt. No. 294 at ¶ 8. Plaintiffs complain they have been unfairly denied access to these records while the Defendants have had unfettered access and control.

On June 5, 2000, one month after the commencement of this lawsuit, the Defendants entered into a "Joint Defense Common Interest Agreement" regarding this litigation and any other pending litigation involving Pyramid Malls. Dkt. No. 290, Ex. 10. Essentially, the Defendants agreed they share a common interest in this litigation and wish to share sensitive documents and disclosures without fear of waiving the corresponding privileges. On October 16, 2001, James T. Potter, Esq., who was retained by PMG to represent it and all current and former employees in this litigation, executed the Joint Defense Agreement, thereby agreeing to be bound by the terms set on June 5, 2000. *Id.* Until this time, Hogan & Hartson and Goodwin & Procter had been advising PMG relative to its relationship or role with regard to this litigation. When depositions began to be scheduled and conducted, Potter was hired presumably to advise PMG's employees who would be deposed rather than Hogan & Hartson and Goodwin & Procter and also probably due to concerns over conflicts of interest. Dkt. No. 273 at p. 1 (Potter's lt-mem). Potter continues his representation of PMG and its employees. *Id.*

Not only have Plaintiffs been thwarted in obtaining many records from PMG, but several discrete areas of inquiry by Plaintiffs at depositions of the Defendants and PMG employees have been met with objections premised upon the Joint Defense Agreement and the attorney-client privilege.[9] Dkt. No. 273, Exs. B & C; Dkt. No 292, Ex. P; Dkt. No. 290, Exs. 4, 5, 6, & 7.

### D. Motion to Compel

Because of the all encompassing nature of the Joint Defense Agreement and the under-

---

**9.** The Defendants frequently bring to the Court's attention that at several of these depositions, Defendants and Mr. Potter asked Plaintiffs whether they intend on pursuing litigation against PMG, or, in the alternative, asked if Plaintiffs would forfeit any claims or litigation against PMG, so that there could be some discussion on whether PMG's claim of attorney-client privilege and work product doctrine could be

lifted. Plaintiffs have either not responded to the requests or stated that they would take the matter under advisement, without advising further. Dkt. No. 292 at pp. 5–6. In deciding whether these confidentiality principles apply in this case, these discussions amongst the parties at the depositions have little repercussions on this decision.

lying co-joined legal principles of attorney-client privilege and work product doctrine, several rather extensive privilege logs have been created by the Defendants. Dkt. No. 295. Plaintiffs submit that Defendants' reliance upon these claimed privileges, particularly under the Joint Defense Agreement, is a rather broad and improper sweep over a multitude of records and should not be countenanced.

Plaintiffs' Motion to Compel seeks the following:

1. All documents listed on the Privilege Logs withheld on the basis of privilege;

2. Unredacted copies of all documents listed on the Privilege Logs redacted on the basis of privilege;

3. Unredacted copies of all redacted documents that are not listed on the Privilege Logs;

4. All documents and information provided by PMG to the Defendants;

5. All documents and information created or obtained by or for PMG or its agents including, but not limited to, Ernst & Young or Deloitte & Touche, for the use of Defendants; and

6. Depositions of Defendants and other authors and recipients of the above documents.

Dkt. No. 295.

Many of the pre-litigation documents can be further distilled into several discrete categories:

(a) The Lugosch Audit papers;

(b) The Bonwit Teller series of documents;

(c) The Chase Loan or LOC;

(d) Recapitalization Project and Equity Consolidation;

(e) Berkshire Refinancing;

(f) Motion for Reconsideration; and

(g) PCK Report.

Dkt. No. 296, Order dated October 28, 2003.

### III. DISCUSSION

#### A. Attorney–Client Privilege

Juxtaposed are two well-grounded principles of law which inextricably collide far too often generating inertia rather than motion during the course of litigation. There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev. ed.1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best ... [only justified] when the opposed private interest is supreme." *In re Megan–Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr.N.D.N.Y.1995) (citing *McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir.1937)). The inertia occurs when such open and notorious revelations of a party's case is impeded or stymied by another old, enduring, and frequently invoked principle, the attorney-client privilege.

The attorney-client privilege is a long-standing common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501. This rule has perpetuated as a legal doctrine for eons to encourage full engagement between a party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive in return advice which will protect the client's legal rights. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448 (S.D.N.Y. Jan. 16, 1996). The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent. *In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381, 386 (S.D.N.Y.1975) ("The sine qua non of the attorney client-privilege is ... a confidence reposed ....").

■ When determining if there is in fact an attorney-client privilege present to cloak both forms of communication, a court needs to ascertain that this safety net attaches to

only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y.2001); *see also* 8 WIGMORE, EVIDENCE § 2292. This privilege, as previously stated, further attaches to the advice rendered by the attorney. *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943–44 (2d Cir.1992).

■ Contrary to modern and ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989). Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ("However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973) (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214. The privilege is a double edged sword however. Though it was devised with altruistic intentions to permit a greater good in enabling uninhibited communication, it can also serve a less than honorable purpose, that is, being employed surreptitiously as a cover-up for nefarious objectives.

■ As to exceptions, there are circumstances, and permutations thereof, that cause waivers upon waivers to this less than sacrosanct rule. Cynthia B. Feagan, Comment, *Issues of Waiver In Multiple–Party Litigation: The Attorney–Client Privilege and the Work Product Doctrine*, 61 UMKC L. REV. 757 (1993). We need not now address all of the potential waivers and exceptions to the attorney-client privilege, but it is necessary in the context of this case to draw upon that waiver which invariably causes lawyers the greatest angst. *See In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13 (W.D.N.Y.1997) (survey of the various types of waivers under New York and federal cases). The waiver to which we speak is whether the client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party. A waiver such as this may be done explicitly or implicitly, or conversely, intentionally or inadvertently. 6 JAMES M. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed.1999); *Pfohl Bros.*, 175 F.R.D. at 24–26. Obviously, when communications between a party and her attorney occur in the presence of a third party, the privilege **may** be waived. *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1298–99 (D.C.Cir. 1980). Yet, a disclosure·to a third party does not waive the privilege unless such disclosure is inconsistent with the "maintenance of secrecy" and if the disclosure " 'substantially increases' the possibility of an opposing party obtaining the information." *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51–52 (S.D.N.Y.1979). For example, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *Schwimmer*, 892 F.2d at 243 (accountant); *United States v. McPartlin*, 595 F.2d 1321, 1336–37 (7th Cir.1979) (investigator); *United States v. Kovel*, 296 F.2d 918, 921–24 (2d Cir.1961) (disclosures to an accountant does not waive attorney-client privilege).

But does another exemption exist in the framework of a multi-party litigation where, as here, the parties purportedly have agreed to work together for their better good, at least so far as defending the various claims within the litigation? Upon first blush, it

would appear that sharing such intimates with these third-parties, notwithstanding their role in the case, would constitute a waiver. However, developing out of multi-party litigation, joint defense agreements have redefined this presumption and carved out an exception to the notion that such disclosures are waived, or better yet, have extended the concept of attorney-client privilege to another realm of protection. 6 MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed.1999); Feagan, Comment, *Issues of Waiver In Multiple–Party Litigation: The Attorney Client Privilege and the Work Product Doctrine*, 61 UMKC L. REV. 757.

■ With its history being relatively brief, burnished in litigation modernity, the joint defense doctrine evolved out of criminal law practice, where co-defendants prevalently roam, and spilled over into multi-party civil litigation and representation. *Power Mosfet Tech. v. Siemens AG*, 206 F.R.D. 422, 424 (E.D.Tex.2000). The joint defense privilege is not a stand alone doctrine but is rooted solely within, and is solidly based upon, the attorney-client privilege. *Schwimmer*, 892 F.2d at 243. This joint defense privilege has many monikers such as the common interest doctrine, common interest arrangement doctrine, or pooled information doctrine. Unfortunately, courts, commentators, and attorneys use these terms interchangeably even when they do not serve the same purpose.[10] To be clear, in our case, we are addressing a joint defense agreement used in the context of litigation.

■ Federal circuits are not all on the same page and perceive the joint defense privilege quite differently. *United States v. Weissman*, 1996 WL 737042, at *7–10 (S.D.N.Y. Dec. 26, 1996) (survey of cases); *see also In re Megan–Racine Assocs.*, 189 B.R. at 570–72 (survey of New York state cases). The Ninth Circuit, probably being the first Court of Appeals to rule on the joint defense privilege, now with other circuits, has a relatively broad view of the doctrine. Whereas the Second Circuit, though considering other circuits' precedents, has adopted a more conservative perspective of the privilege's expanse, to which all of the district courts within this circuit have rigorously adopted. *Weissman*, 1996 WL 737042, at *7–10. This Court likewise, will, as it must, follow the Second Circuit's interpretation of this privilege. The Second Circuit's perspective is summarized in *U.S. v. Schwimmer*:

> The joint defense privilege, more properly identified as the "common interest rule," *see generally* Capra, *The Attorney–Client Privilege In Common Representations*, 20 Trial Lawyers Quarterly, Summer 1989, at 20, has been described as "an extension of the attorney client privilege," *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir.1987). It serves to protect the confidentiality of communications passing from one party to the attorney for

**10.** It is important for us to distinguish between common interest arrangements and the joint defense privilege being discussed herein. The latter develops from the context of litigation as needed by joint litigants to promote a shared strategy therein, and has been widely accepted. On the other hand, the common interest arrangement doctrine, gaining acceptance in the legal community and the courts, includes both litigation and non-litigation matters. In essence, the common interest arrangement extends the joint litigant premise further and permits parties to share information outside of its normal legal advice infrastructure even though it may not involve a lawsuit. The intra-group sharing of communications, documents, and advice is protected. If there exists a community of legal interests, and the parties find there is some benefit to collectively receive legal advice and strategy, these parties will commingle information and advice and consort to draft a legal stratagem which satisfies this goal. James M. Fischer, *The*

*Attorney–Client Privilege Meets the Common Interest Arrangement: Protecting Confidences While Exchanging Information for Mutual Gain*, 16 REV. LITIG. 631 (1997). Though gaining acceptance, not all courts have embraced its broadened breadth. *See North River Ins. Co. v. Columbia Cas. Co.*, 1995 WL 5792, at *2 (S.D.N.Y. Jan. 5 1995) (community of interest doctrine); *In re Megan–Racine Assocs.*, 189 B.R. at 571–72; *Emons Indus. Inc. v. Liberty Mut. Ins. Co.*, 747 F.Supp. 1079, 1082 (S.D.N.Y.1990); *see also* Douglas H. Flaum and Rachel Sims, *Using The Common Interest Doctrine to Prevent a Waiver of Privilege*, N.Y.L.J., Jul. 25, 2003. We need not however concern ourselves with its applicability to our case, since we are already within the throes of litigation and are, at minimum, confronted with the notion "in the anticipation of litigation." Thus the joint defense privilege, also known as the common interest defense, will serve as the more appropriate legal principle.

another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. *See United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir.1989). Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120 (3d Cir.1986). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter," Capra, 20 Trial Lawyers Quarterly, at 21 (citation omitted), and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply, *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987), *vacated in part on other grounds*, 842 F.2d 1135 (9th Cir. 1988) (en banc), *aff'd in part and vacated in part on other grounds*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Neither is it necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney. *Matter of Grand Jury Subpoena*, 406 F.Supp. 381 (S.D.N.Y.1975); *cf. Hunydee v. United States*, 355 F.2d 183 (9th Cir.1965).

892 F.2d at 244 (typefaces in original).[11]

▬ In order then for documents and communications shared amongst these litigants to be considered confidential, there must exist an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy. *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 893 (S.D.N.Y. 1999) (citation omitted); *Weissman*, 1996 WL 737042, at *10. It is obviously prudent nonetheless to have a joint defense memorialized in writing. Too often the vagaries of an oral agreement cloud and pollute the true intent of the parties, especially when the parties claiming the privilege must establish that there was in fact an agreement and that the specific communication was protected thereunder. *In re Bevill, Bresler, & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir.1986) (court denied the privilege because party failed to show that the communication was made during the course of a joint defense agreement); ·*Power Mosfet Tech. v. Siemens AG*, 206 F.R.D. at 425 (a written agreement may not be necessary but with an oral agreement you run the risk). Paramount to the common interest doctrine, there must be a commonality of interest amongst the members to the agreement and each party must reasonably understand that the communications are provided in confidence. *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir.1999); *Bank Brussels Lambert v. Credit Lyonnais Suisse S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y.1995) (commonality of interest is more than concurrent interest).

▬ To the extent that the communications were made in confidence amongst the agreement's allies designed to meet their mutual concerns, they ought to be deemed confidential pursuant to the attorney-client privilege. *In re Grand Jury Subpoena*, 406 F.Supp. at 392 ("That a joint defense may be made by somewhat unsteady bedfellows does not in [and of] itself negate the existence or viability of the joint defense."). But, and it is worth repeating, **only** those communications made in the course of an ongoing common litigation enterprise with the intent to further the enterprise are protected. *Schwimmer*, 892 F.2d at 243; *In re Bevill*, 805 F.2d at 126. Counsel need not be present each and every time his respective member to the joint defense agreement speaks with an attorney who represents another member of the group. The Court is persuaded, in light of *Schwimmer*, that if a joint defense agreement exists there is an implicit understanding that one attorney is permitted not only to confer with another but with the other attor-

---

11. Another context in which the notion of joint representation may prevail is when more than one party is represented by the same counsel. Though fraught with perils of conflicts of inter-est, the communications between the parties in the presence of the attorney are nonetheless privileged.

ney's party. *Schwimmer*, 892 F.2d at 244 (citing *In re Grand Jury Subpoena*, 406 F.Supp. at 391–92 (permitting attorney interviews of others without the presence of their own attorney and in the presence of other co-defendants)); *see also United States v. McPartlin*, 595 F.2d at 1336–37 (deeming confidential communications to an investigator for a co-defendant's attorney fell within the joint defense privilege); *United States v. Walker*, 910 F.Supp. 861, 865 (N.D.N.Y.1995) (investigator and other agents). It is clear that the parties conferring amongst themselves, outside the confines of the group, and not for the purpose of collecting information in order to obtain legal advice, do not preserve the privilege because in that event they are not seeking legal advice or sharing information to receive legal advice.

█ The common enterprise must be for a legal purpose, and not solely commercial, although it may possibly serve both purposes. *Bank Brussels Lambert*, 160 F.R.D. at 447. The commercial aspect shall not be the controlling purpose but its presence in the mutually agreed strategy will not vitiate its effect. *Shamis v. Ambassador*, 34 F.Supp.2d at 893. Conversely, however, if the common enterprises embarked on a business mission, though there is a concern about the presence of litigation, the common interest privilege will not be applicable. *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16 (E.D.N.Y.1996); *see also In re F.T.C.*, 2001 WL 396522, at *4 (S.D.N.Y. Apr. 19, 2001).

█ Obviously, joint defense agreements present a pooling of resources, a healthy exchange of vital information, a united front against a common litigious foe, and the marshaling of legal talent and advice. *Transmirra Prod. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 579 (S.D.N.Y.1960); Edna Selan Epstein, *The Attorney–Client Privilege and the Work Product Doctrine*, A.B.A. Sec. Litig. 201–06, 208–17 & 218–19 (4th ed.). The essential benefit of such joint collaboration however is that a member of the common legal enterprise cannot reveal the contents of the shared communications without the consent of all the parties. *In re Grand Jury Subpoena*, 406 F.Supp. at 393 ("[W]ithout it the protection is reduced to an improb-

able alternative."). That is, the privilege continues long after a member of the agreement has departed from the legal consortium and none of the parties to the agreement may unilaterally waive the privilege. But when one of the members of the legal consortium finds itself litigating against one or more of the other members, other rules are invoked to determine if the obtained communication can be revealed in court, especially when testimony by one is being precluded because of the common interest doctrine. *Id.* at 394 (another should not be reasonably allowed to deny another the use of information which he already possesses by virtue of his own efforts or disclosure).

█ A key issue in this case is whether a non-party to the litigation can join a joint defense agreement, receive all of the benefit inured under such agreement, and be obligated to the same degree as the co-parties. The answer is an unreserved affirmative. First, there is no requirement that there be actual litigation in existence at the time the agreement is executed. *Id.* at 389 (concluding that the attorney-client privilege covers communications "to a prospective or actual co-defendant's attorney when those communications are engendered solely in the interest of a joint defense effort"). In that instance, the joint defense privilege should not be so narrowly construed to be limited solely to co-parties as long as the parties sharing the information have the same reasonable expectation of a shared legal bond and the anticipation of litigation is present. *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285 (D.C.Cir.1980). Obviously then, the real prospect of litigation may be a sufficient basis to form a joint defense agreement almost at any stage where litigation is feared. 6 Moore's Federal Practice § 26.49[5] (a palpable threat of litigation). The invocation of the attorney-client privilege as extended by the joint defense agreement appears patently obvious when parties share a common interest and who anticipate the palpable likelihood of litigation against them. In that case, they should be able to prepare to defend or even prosecute litigation jointly as long as all of the other elements for the joint defense doctrine exist. *United States v. Zo-*

*lin,* 809 F.2d 1411, 1417 (9th Cir.1987) (privilege extended to those not sued and who may not have any liability); *In re Megan–Racine Assocs.,* 189 B.R. at 573 (the non-party reasonably believed that they could be made a party to the litigation).

### B. Work Product Doctrine

Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work product doctrine will be advanced. With regard to joint defense agreements, as it may have an effect on the waiver of the work product, such determination is controlled by the same precedents stated above inasmuch as attorneys' mental impressions and legal strategies are shared with those who share a common legal interest in the anticipation of litigation or actual prosecution or defense thereof. *In re Megan–Racine Assocs.,* 189 B.R. at 573–75.

■ The work product privilege is more broad than the attorney-client privilege. *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000). This privilege exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation. *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989). Indeed, the work product privilege is designed to protect an adversarial system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries. *United States v. Adlman,* 68 F.3d 1495, 1500–01 (2d Cir.1995) (*Adlman I*) (citing *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)); *see also In re Minebea Co., Ltd.,* 143 F.R.D. 494, 499 (S.D.N.Y.1992). Of course the burden, albeit not a heavy one, of establishing that the work product doctrine applies rests with that party's attorney. The doctrine is invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privilege or provides notification that it will not be disclosed for this reason. FED. R. CIV. P. 26(b)(5) & 34(b). Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges. Notwithstanding following these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative. *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.,* 825 F.2d 676, 680 (2d Cir.1987).

■ FED. R. CIV. P. 26(b)(3) provides the relevant rule on the discovery of work product material. It reads in part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

■ It is important to note that the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit

its release. *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y.2001) (citing *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C.Cir.1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401, 101 S.Ct. 677. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir.1998) (*Adlman II*). In a similar vein, in most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y.1997) *with In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir.2002).

■■■■ "[W]here a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *Adlman II*, 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. *Adlman I*, 68 F.3d at 1502; *Strougo v. BEA Assocs.*, 199 F.R.D. at 521. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman I*, 68 F.3d at 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents.

Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Adlman I*, 68 F.3d at 1502.

■■■■ As to the work product doctrine, the legal theorems of the joint defense privilege are applicable as well. Considering that the attorney-client privilege protects communications and the work product doctrine protects tangible items which may contain strategies, impressions, and attorney's opinions, both the privilege and the doctrine may be waived in various ways including sharing such documents with a third party. *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 22–28 (W.D.N.Y.1997) (survey of the various types of implicit and explicit waivers); *see also* Feagan, Comment, *Issues of Waiver in Multiple–Party Litigation*, 61 UMKC L. REV. at 775–77. However, just as the common interest doctrine, also known as the joint defense privilege, does not waive the attorney-client privilege when those communications are shared with co-parties, likewise, the mutual sharing of strategies, mental impressions, and/or attorneys' thoughts and theories with co-parties, deserves the same or similar protection. The exchange of work product among attorneys with identical litigation perspectives should not render such tangible information "vulnerable to pre-trial discovery." *Transmirra Prod. Corp. v. Monsanto*, 26 F.R.D. at 578. As long as the information is being prepared in anticipation of litigation, and the disclosure to co-parties is made in pursuit of preparation for trial and is not inconsistent with maintaining secrecy from their adversary, a waiver of the work product doctrine should not be considered. *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 587 & 590 (N.D.N.Y.1989) (citations omitted). Disclosure of work product material in such a way which "substantially increases the opportunity for potential adversaries to obtain the information" is our rule of thumb when the protection should fall. *Id.* at 587 ("[S]haring work product material with a

friendly party does not waive the work product protection as it applies to an adverse third party.") (citations omitted); *Magee v. Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 641 (S.D.N.Y.1997) (ruling that the work product doctrine is not "automatically" waived by disclosure to a third party unless such disclosure "substantially increases the opportunity for potential adversaries to obtain the information") (citing, *inter alia, In re Grand Jury Subpoenas,* 561 F.Supp. at 1257).

The co-parties asserting the joint defense privilege will still be required to demonstrate, *inter alia,* they had a shared common interest and prior to sharing the work product amongst them, there existed an agreement that they will pursue a joint-defense strategy. *In re Megan–Racine Assocs.,* 189 B.R. at 574–76.[12]

### C. Analysis of Joint Defense Privilege

Plaintiffs vigorously challenge the notion that PMG, currently a non-party to this litigation, could possibly be included under this Joint Defense Agreement's protective umbrella. Very fervently, they charge that Defendants have become so accustomed to using PMG "to suit their personal needs that they see nothing wrong with using PMG to defend themselves in this action" by binding them into a joint defense agreement. Dkt. No. 293 at p. 1. Therefore, they ask this Court to shred this agreement and pierce the underlying attorney-client privilege and work product doctrine.

As soon as Plaintiffs' requested, in 1998, to have an independent agency review the records of PMG and the subsequent complaints of mismanagement being tossed about by Plaintiffs, the Defendants were entitled to seek advice from an attorney and possibly prepare a defense to anticipated litigation.[13]

As to those documents prepared prior to May 22, 2000, the commencement of this litigation, Defendants have established that a string of law firms provided advice on the "Lugosch Audit Litigation." (Submitted under seal). This advice extended far beyond ordinary business legal advice and was mostly directed at the possibility of litigation on many fronts and on many issues. When this litigation was in full gear, Hogan & Hartson, later joined by Goodwin & Procter, assumed the legal helm of PMG as it pertained to this case. They guided PMG's production of documents, reviewed the particulars, and decided what, if anything, would be revealed or cloaked with confidentiality. The continuity of attorney-client privilege and the work product doctrine was not broken when James Potter, Esq., assumed responsibility to advise PMG and its employees with regard to this litigation.

It is not beyond credulity for PMG to believe it would be sued by the Plaintiffs, and possibly as early as 1998. This belief is further credited by the fact that five of its principal officers have been sued. Throughout Plaintiffs' Complaints, which have been amended several times, Plaintiffs make many serious allegations against PMG as a conspiratorial force with Congel and others to defraud the Plaintiffs. One would expect that such charges would make a reasonable person suspect that litigation against them is afoot.

We agree with the Plaintiffs that, pursuant to 28 U.S.C. § 1962(c) (Civil RICO), PMG, as a corporate entity, cannot be simultaneously deemed to be the criminal enterprise and then be sued as the person who conducts the affairs of the enterprise to participate in a pattern of racketeering. *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 315 (2d Cir.1985).[14] This pro-

---

**12.** For further guidance on the work product doctrine, its requirements, and waiver thereof, the parties are directed to *Lugosch v. Congel,* 218 F.R.D. 41, 47–52 (N.D.N.Y.2003). Dkt. No. 284.

**13.** There has been reference to a July 19, 1998 letter, which has been provided to the Court, wherein Plaintiff Lugosch made many allegations against PMG and its officers. Accepting as true, this clearly could have raised reasonable alarm

for PMG and the Defendants to seek legal advice and prepare for the possibility of litigation.

**14.** In *Bennett v. U.S. Trust,* the Second Circuit elaborated further by stating,

requiring a complaint to distinguish between the enterprise and the person conducting the affairs of that enterprise in the prohibited manner is supported by the plain language of section 1962(c), which clearly envisions two

hibition notwithstanding, Plaintiffs ignore that other causes of actions against PMG are not similarly precluded. PMG, as easily as its five principal officers, could have been sued for conversion, fraud, and/or conspiracy. When Plaintiffs speak about PMG, corruption is almost always included within the same sentence. What is worse, Plaintiffs still contend that Defendants "affirmatively used PMG to manufacture evidence in this case." Dkt. No. 293 at p. 1. Indubitably, such allegations and criticisms could readily support the causes of action of fraud and/or conspiracy. Plaintiffs pull no punches on how they view PMG and its role in this litigation. All of this is well summarized in one paragraph of the Complaint:

> PMG, through Defendants .... have (1) regularly, intentionally and continuously failed to provide financial reports to the Partners; (2) [supplied] misleading financial information to the Partners on the occasions when reports have been provided; (3) regularly, intentionally and continuously commingled, via mail and/or wire, Partnerships' monies with the funds of unrelated Portfolio partnerships and other wholly unrelated business entities controlled by Congel; and (4) actively engaged in and permitted the conversion and use of Partnership funds for non-Partnership uses, all as described in greater detail below.

Dkt. No. 269 at ¶ 42.

Grievances of commingling, conversion, fraud, and more are replete throughout the Complaint. Obviously Plaintiffs' and PMG's interests under these circumstances were not common, but inimical to each other. Since a corporation can be held liable by the action of its agents, here PMG's officers, a lawsuit could have embraced these and probably other common law causes of action. Consistent with these allegations, a breach of contract

cause of action is also evident. Because they are not immunized from being sued, PMG was within proper rights to seek legal advice and prepare documents in anticipation of litigation.

Moreover, PMG was within their right to join those who have an identical common interest in defending a real, or palpably threatened, lawsuit by executing this Joint Defense Agreement. How could PMG and other PMG employees not seek the benefit of the joint defense privilege especially when the top five principal officers have been sued? It is elementary logic that if the Plaintiffs would sue these five actors, why not sue others who may have interacted with them during the course of their employment, and if that reasoning is sound, then why not join them in presenting a united legal front.

The Court recognizes that PMG is an authorized member of the Joint Defense Agreement dated June 5, 2000. Overall, Defendants and PMG have met their burden in establishing the attachment of the attorney-client privilege and the presence of the work product doctrine, separately and within the confines of the Joint Defense Privilege. We still must assure ourselves that each of the categories of documents being sought by Plaintiffs have not been waived under another principle of law or that documents claimed to be work product are in fact work product.

### D. Fiduciary Exception

■ The attorney-client privilege may be pierced when a fiduciary relationship is implicated. Generally, this legal doctrine is known as the *Garner* Rule. *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970).[15] *Garner* essentially concerns the attorney-client privilege and the relationship between shareholders and their corporation, but the

---

entities. Moreover, requiring a distinction between the enterprise and the person comports with legislative intent and policy. Such a distinction focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.
770 F.2d at 315 (citing *B.F. Hirsch v. Enright Ref. Co. Inc.*, 751 F.2d 628, 633–34 (3d Cir. 1984)).

**15.** This Court noted in *Henry v. Champlain Enter., Inc.*, 212 F.R.D. 73, 84 (N.D.N.Y.2003), that the Second Circuit has not expressly adopted the *Garner* Rule but other courts within this circuit have. The Second Circuit has found, however, in ERISA cases that there is a fiduciary exception to the attorney-client privilege. *Id.* at 85 (citing *In re Long Island Lighting Co.*, 129 F.3d 268, 271–72 (2d Cir.1997)).

doctrine has expanded to include other fiduciary relationships as well. *See, e.g., In re Occidental Petroleum Corp.*, 217 F.3d 293 (5th Cir.2000) (applies to ERISA plans). The *sine qua non* of the *Garner* Rule is that the actors in the fiduciary relationship have a "mutuality of interest" in seeking advice. *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448, at *8 (S.D.N.Y. Jan. 16, 1996).

■ The fiduciary exception is not limited to the corporate realm nor shareholder derivative actions. The exception encompasses fiduciary relationships such as unions and members, lawyers and other lawyers, banks and clients, and general partners in both general and limited partnerships. *Henry v. Champlain Enter., Inc.*, 212 F.R.D. 73, 84–85 (N.D.N.Y.2003).[16] The essential factor of this rule is the fiduciary relationship which inextricably defines the exception's parameter; thus, the fiduciary exception is inapplicable to non-fiduciary matters. *Id.* at 85 (citing *In re Long Island Lighting Co.*, 129 F.3d 268, 271–72 (2d Cir.1997) & *Hudson v. Gen. Dynamics*, 73 F.Supp.2d 201, 202–03 (D.Conn.1999)).

■ The *Garner* Rule and/or fiduciary exception is limited to invasion of the attorney-client privilege and is not extended to the work product doctrine. *Henry v. Champlain Enter.*, 212 F.R.D. at 88 (citing *Strougo v. BEA Assoc.*, 199 F.R.D. 515, 524 (S.D.N.Y. 2001) & *Chun Hua Mui v. Union of Needletrades*, 1998 WL 915901, at *3–4 (S.D.N.Y. Dec. 30, 1998) (disclosing work product would be revealing the defense of a lawsuit)). An obvious reason why this rule is not extended to work product is that there is evidently an absence of a "mutuality of interest" between the fiduciary and the principal. Another reason is that the work product belongs to the litigator not the litigant fiduciary and it is the lawyers' impressions, strategies, and theories, the law is attempting to guard.

■ In our case, there is the possibility of two fiduciary relationships, which would require us to investigate whether the fiduciary exception would be another avenue of piercing the attorney-client privilege. Pursuant to its management agreement with the respective Malls, PMG has fiduciary responsibilities to them based upon the law of agency. *See supra* Part II.A at pp. 8–9. In this regard, PMG would have certain fiduciary obligations to all of the partners of these partnerships, which includes the Plaintiffs herein and their respectively owned Malls. As Defendant Malfitano previously testified in another proceeding, "he has 17 different masters." Dkt. No. 290, Ex. 7 at 151.[17] Moreover, the general partners to the Malls owned by the Plaintiffs, which may include Defendants, have fiduciary responsibilities to the Plaintiffs as well, premised upon the partnership agreements and the law. N.Y. PARTNERSHIP LAW § 43; *NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships*, 143 F.3d 38, 39 (2d Cir.1998) ("A partner, as a fiduciary, is held to higher standards than those of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.") (citation omitted); *see also* Dkt. No. 147, Order, dated Jan. 15, 2002, at p. 31. But, in addition

---

**16.** Listed precedents for these various fiduciary relationships which trigger the exception can be found in *Henry v. Champlain Enterprises*:

N.Y. PARTNERSHIP LAW § 43; *NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships*, 143 F.3d 38, 39 (2d Cir.1998) ("A partner, as a fiduciary, is held to higher standards than those of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." (citation omitted)); *Asian Vegetable*, 1996 WL 14448, at *6 ("the *Garner* approach is not premised on concepts peculiar to corporate law, but rather has its underpinning in the common law of trust relationship") (quoting *Donovan v. Fitzsimmons*, 90 F.R.D. 583 (N.D.Ill.1981) (union ERISA pension fund)); *In re Sunrise Sec. Litig.*,

130 F.R.D. 560 (E.D.Pa.1989) (law firm with conflicting duties to itself and client); *Quintel [Corp., N.V.] v. Citibank[, N.A.]*, 567 F.Supp. 1357 [S.D.N.Y.1983] (bank acting as fiduciary on a land deal). Indeed, the Fifth Circuit [case] that spawned the *Garner* rule recognizes that there exists a fiduciary exception, particularly in ERISA cases, independent from *Garner* analysis; *see also In re Occidental*, 217 F.3d at 296–7 (citing to *In re Long Island Lighting Co.*, 129 F.3d 268, 271 (2d Cir.1997)). 212 F.R.D. at 84–85.

**17.** *See also* Dkt. No. 290, Ex. 1, (memorandum written by Marc Malfitano to all of the Pyramid partners stating, "I will be in contact with each of you individually regarding the above").

to determining the existence of a fiduciary relationship, we must further investigate whether the attorney-client communications pertain to fiduciary or non-fiduciary matters.

### E. Analysis of the Documents

Most, if not all, of the confidential records being sought by the Plaintiffs are or were held by PMG, the managing company. The Court accepts, where vital, that the Plaintiffs have established on the record good cause to make this application to pierce the attorney-client privilege, no matter the basis, i.e., *Garner* Rule.

#### 1. Lugosch Audit Papers

 As discussed above, it appears that in 1998 Plaintiffs Lugosch, Bersani, and Steingarber hired Investigative Group International (IGI), presumably to review the financial records and other documents held by PMG on the Malls in which they were partners. Apparently, based upon the request and the retention of IGI, officers of PMG became alarmed and sought legal advice from several different law firms. Concomitantly, Plaintiff Lugosch sent a letter, dated July 9, 1998, to PMG in which he registered serious complaints of mismanagement and other malfeasance. In conjunction with legal advice, audits of these Malls were performed and shared with the lawyers so that appropriate advice could be given. The legal involvement on this issue spanned approximately three years prior to this litigation. Defendants argue that (1) these records were prepared in anticipation of litigation and (2) are of a non-fiduciary purpose.

The Court finds that indeed the Lugosch Audit Papers were prepared in anticipation of litigation with Lugosch, and we further find that these papers were also prepared for a non-fiduciary reason. Sharing these papers with the other Defendants, under the purview of a Joint Defense Agreement, even if done prior to the written agreement, did not doom the privilege. All that is necessary to extend the privilege to this agreement, and inextricably to these papers, is an identical common interest and that the communications and documents were shared with the understanding that they would not lose their confidential nature. *Schwimmer*, 892 F.2d at 243; *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d at 893.

However, if these Lugosch Audit Papers were shared with Defendants' accounting expert, Stanley Perla, so that he may render an opinion which will be used in this case, the attorney-client privilege and the work product doctrine may have been waived. *See infra* Part III.E.7.

#### 2. Bonwit Teller Series of Documents.

Bonwit Teller Limited Partnership has been one of many issues discussed repeatedly throughout this litigation. Defendants represent to the Court that many of the Bonwit Teller documents have been disclosed to Plaintiffs in January 2003 pursuant to a non-waiver agreement. Bonanno Decl. at ¶ 14 (filed under seal).[18] There remains less than a handful of Bonwit documents not shared with Plaintiffs that are now being sought.[19] Defendants asseverate that Woodchuck Associates sought legal advice as to documents designated 67 and 107 on the privilege log. Whereas, documents designated 91 and 199 were prepared in anticipation of litigation from Plaintiffs Robert Ungerer and Jerry Dick.

 As to the documents prepared for Woodchuck Associates, this Court had previously addressed the issue of whether these records were cloaked by the attorney-client privilege and, if so, whether the fiduciary exception would pull the cloak and lay the document bare. Succinctly, the Court found, with regard to this issue, that Woodchuck did not have fiduciary obligations to the Plaintiffs which would require disclosure of the document. Dkt. No. 147, Order, dated Jan. 15, 2002, at pp. 22–25, 28–32, 33, & 36–38. In this respect, the law of the case

---

18. Ms. Bonanno represents that the following documents, represented by numerical designations, have either been or will be disclosed to Plaintiffs pursuant to a non-waiver agreement: 1–3, 5, 7, 12–40, 41–52, 60, 65, 108, 143, 160, 205–07, 210, 212, & 251.

19. These Bonwit Teller documents are identified in Defendants privilege log as numbers 67, 91, 107, and 199.

controls. *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir.1991).[20]

■ With respect to the documents designated 91 and 199, although the notations on the log indicate "legal advice on Bonwit structure," Defendants assert that these documents were prepared in connection with litigation against one of the Plaintiffs and another individual. These documents are shielded by the work product, and if there was a potential fiduciary relationship, the fiduciary exception rule does not apply to work product, and moreover this appears to be a non-fiduciary matter. *See supra* III.D at pp. 33–35; *Strougo v. BEA Associates*, 199 F.R.D. at 524.

As to the Bonwit Teller issue, the Court finds the Defendants established that the following documents, designated by a number, are privileged and not waived by any legal reason: 67, 91, 107, 109, 198, 199, and 216.

There is another privilege log, dated August 12, 2003, that mentions Bonwit Teller related documents which are attested to be privileged. Dkt. No. 295, Ex. 4. Defendants represent that items designated 1–5 on this particular log will be shared with the Plaintiffs consistent with the non-waiver agreement. Documents designated 6 and 7 shall remain confidential inasmuch that the privilege has been established. Christopher Moore, Esq., Decl., dated Nov. 6, 2003, at ¶¶ 7 & 10 (under seal).

*3. Chase Loan or Letter of Credit (LOC)*

In 1998, a $200,000,000 loan was procured from Chase Manhattan Bank ("Chase") apparently by Robert Congel and his Family Trust Partnerships, and most of the funds were lent to the Pyramid Mall entities to complete ongoing projects or to expand efforts to increase the properties' market values. Dkt. No. 269 at ¶¶ 94–99, 3rd Am. Compl.; Dkt. No. 278 at ¶¶ 94–99, 3rd Am. Ans. It appears that both parties agree that Congel and the Trust Partnerships, and not the Pyramid Malls, obtained this loan. However, Plaintiffs allege that the cost of this loan was purportedly shown as a bona fide debt on the financial statements of the Plaintiffs' Partnerships when it should not have. Dkt. No. 269 at ¶ 97.

Previously this Court acknowledged that it was quite perplexed as to who secured this loan and for whom or what. It was unclear whether it was purely personal or for partnership business, especially when the loan is juxtaposed against the allegations of improper inter-company loans and commingling of assets. On that basis, the Court ordered that the documents related to **the loan application** to Chase must be disclosed unredacted. Dkt. No. 147, Order, dated Jan. 15, 2002, at pp. 19–22. We presume that Defendants have complied with this disclosure and provided all documents related to the loan application which were submitted to Chase Manhattan Bank.

Now, Defendants aver that the documents reflected on the privilege log which are connected to the Chase Loan are protected by

**20.** The law of the case doctrine is a seminal principle of law. Essentially under this doctrine, any decision on an issue of law made at one stage of a case becomes a binding precedent to be followed throughout the litigation. *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir.1991) (citations omitted). The Second Circuit concluded that:

> "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (dictum)). This doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue. 1

B *Moore's Federal Practice* ¶ 0.404[1], at 120 ("[L]aw of the case is . . . a rule of practice and not a limit on authority.").

*Id.* at 592 (typefaces in original).

The underlying considerations for this doctrine are obvious; to maintain fairness to the parties; to maintain consistency throughout the litigation; to avoid reconsideration of matters once decided during the course of the litigation; and to promote judicial economy and societal interest in finality. *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir.1999) (a litigant should not be allowed to disregard this doctrine to prejudice the party seeking the benefit of the doctrine); *see also County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir.1997); *Soto-Lopez v. NYC Civil Serv. Comm.*, 840 F.2d 162 (2d Cir.1988).

either the attorney-client privilege or work product, and moreover, these documents do not relate to Plaintiffs' Partnerships because the loan was a personal obligation of Congel and the Trust Partnerships. Bonanno Decl. at ¶¶ 17–19. Some of these documents had been shown to third parties, as agents of Congel who are also Defendants in this case. These agents assisted the lawyers in gathering information so that the legal advice could be shared with Congel and the Trust Partnerships. *Id.* at ¶ 19.

As a general proposition, those documents identified as being attorney-client privileged or work product on the Chase Loan or LOC are now being deemed confidential and that a waiver of those privileges had not occurred. Our previous Order on the Chase Loan matter, and their revelations, was restricted to the loan application and those documents submitted directly to the bank, and for good reason: release to a third party waives any privilege if it previously existed. The previous Order does not apply to these documents now in question. More specifically, the Court finds, though it may not be entirely inclusive, that the following documents, designated by numbers, are protected: 68, 69, 71, 73–75, 86, 87, 89, 94–106, 132–37, 148, 152–58, 175–78, & 181–93. However, the Court does not take the same view of those documents that reference Chase Securities, Inc.

 In April 1998, an announcement was made that the Pyramid Malls would be marketed and sold, and such an announcement appeared in the Wall Street Journal and local newspapers. Dkt. No. 269 at ¶¶ 92 & 93; Dkt. No. 298, at ¶¶ 92 & 93. Chase Securities was selected to be the investment bank for this marketing and sales effort. Dkt. No. 269 at ¶ 94. Since the marketing and sale of the entire Pyramid portfolio would include and affect Plaintiffs' Partnerships as well,

their general partners, who were privy to discussions with Chase on their investment role, possessed a fiduciary duty to share with their other partners the details of this arrangement. Thus, those documents that are noted as Chase Security documents shall be disclosed to Plaintiffs. The Court discerns those documents to be as follows: # 70 (Chase Securities engagement letter) and # 158 (notes on the engagement letter).[21]

### 4. *Recapitalization Project and Equity Consolidation*

These two items concern two independent subjects. The Recapitalization Project pertains to the above mentioned attempts to sell the Pyramid Mall portfolio. Defendants represent that these documents, or portions of documents, that involve this Project have been provided to Plaintiffs. Bonanno Decl. at ¶ 24. With that representation being made, the Court need not address this issue.

 With regard to Equity Consolidation documents, Defendants contend that collectively there was legal advice provided to Congel and the Trust Partnerships regarding majority partners' rights, particularly as it may relate to purchasing other partners' interests. *Id.* at ¶ 25. This type of advice to a majority partner clearly is non-fiduciary, does not invoke the fiduciary exception, and thus need not be disclosed. Then, those documents, designated 121–25 and 127, remain cloaked by the attorney-client privilege.[22]

### 5. *Motion for Reconsideration*

Defendants' documents which referred to their Motion for Reconsideration, dated September 30, 2002, are claimed to be privileged. Now, Defendants are willing to produce those documents and agree to produce documents designated 41–44, 60, and 61 from the

---

**21.** Once again, there appears to be some confusion. Documents designated 70 and 158 are identified as Chase Securities documents. On another sealed log, which provides greater details as to the privilege claims, these documents are noted as Chase Loan. To clarify the Court's direction, if they relate to Chase Securities they must be disclosed and if they are related to Chase Loan they do not need to be disclosed.

**22.** Unfortunately, until now, there was some confusion as to whether the subject matter of the withheld documents on privilege grounds was the Recapitalization Project and/or Equity Consolidation. Dkt. No. 295, Ex 2. Considering the Defendants' representations, this Court has concluded that the withheld documents refer to Equity Consolidation.

supplemental privilege log. Moore Decl. at ¶¶ 7 & 10 (under seal); Dkt. No. 295, Ex. 3. Therefore, this issue is moot.

### 6. Berkshire Refinancing

 It appears that the Berkshire Mall sought financing or refinancing with UBS Warburg and Prudential Insurance Company. PMG was one of several agents who aided or advised Berkshire's partners on this refinancing. The law firm of LeBoeuf Lamb, Greene & MacRae, L.L.P., was the primary outside counsel retained by PMG to complete this transaction and worked closely with PMG's in-house counsel. Defendants affirm that none of the Plaintiffs were partners in this Mall at the time of the refinancing, a fact which nullifies any fiduciary exception analysis. Moore Decl. at ¶ 9.

It is further posited that all of these documents are protected by the attorney-client privilege and several are cloaked by the work product doctrine. After reviewing the supplemental privilege log, and observing no waiver of the attorney-client privilege and/or work product doctrine, the Court finds that documents designated 1–22 remain privileged and need not be disclosed.[23]

### 7. Accounting Record Disclosure

The impact of expert witnesses in modern-day litigation cannot be overstated nor underestimated. *Karn v. Ingersoll–Rand Co.*, 168 F.R.D. 633, 640 (N.D.Ind.1996). In this case, accounting and auditing expertise is the parties' expert of choice. As stated above, Defendants have conducted audits of PMG and the Pyramid Mall Partnerships of which Plaintiffs may have an interest in at least ten of them. As a preliminary step to the audit of the Pyramid Mall Partnerships and PMG, there was testing of some of the cash accounts. Ernst & Young (E & Y) were the auditors, however, Defendants retained Stanley R. Perla, a former partner of E & Y, to provide financial expert testimony in this case. It appears that the crux of his expert testimony is to provide a comparison of management agreements and management fees between the Pyramid Mall Partnerships and other independent entities. Dkt. No. 291, Stanley R. Perla Dep., at pp. 76–82. Prior to rendering an opinion, Mr. Perla participated in E & Y's audit process, reviewed the audit work papers, and spoke with E & Y audit employees. *Id.* at pp. 61, 77–82, & 97. Whether Perla relied upon E & Y's work papers and opinions on these financial statements is still unclear. We are certain, however, that Perla reviewed and considered the audit process, work papers, and his conversations with the audit team prior to providing an expert opinion to the Defendants. Dkt. No. 290, Perla's Expert Report, dated May 19, 2003, Ex. 13 at pp. 2–4, ¶¶ 5–9 (¶ 9, " Based upon E & Y's audit . . . .").

 Mr. Perla issued an expert report, dated May 19, 2003. Dkt. No. 290, Ex. 13. Defendants represent that the expert report, a sample audit report, and a list of PMG's compiled financial statements were provided to Plaintiffs prior to Perla's deposition. Dkt. No. 292 at pp. 9–12, n.10 & 11. Defendants insist that prior to the issuance of Perla's report all documents related thereto were protected by the work product doctrine, which was not lifted until the expert report was disclosed. *Id.* Mr. Perla's deposition occurred on September 18, 2003, which purportedly was six days after the discovery deadline had expired. *Id.* at p. 11. At this deposition, Plaintiffs asked for the engagement letters and E & Y's work papers but such request was denied by the Defendants because, as they contend, the request had not previously been made and now, at this juncture of the litigation, it was being made after the discovery deadline and, thus, untimely. *Id.*[24]

---

**23.** The supplemental privilege log documents items designated as # 7 are a fax and letters to Plaintiffs Lugosch and Bersani. Defendants aver that the letters have been provided to Plaintiffs and only the fax sheet was withheld.

**24.** Considering the near million documents that have been shared during this discovery phase, the Court is perplexed by Defendants' reason not to disclose the engagement letters and work papers: "The reason plaintiffs did not receive those letters and work papers prior to Mr. Perla's deposition is that plaintiffs never asked for them . . . [and] [t]hus plaintiffs do not have these documents [because of] plaintiffs' counsel's failure to make timely requests." Dkt. No. 292 at p. 11. This defense and reason for not disclosing the documents is as shallow as it is disingenuous. Defendants' unacceptable posture on this disclo-

Plaintiffs seek "all documents and information created or obtained by or for PMG or its agents, including, but not limited to, Ernst & Young or Deloitte & Touche (D & T), for the use of Defendants in this case." Dkt. No. 295 at p. 2. In order to address this as a singular or more narrowly defined issue, this request will be distilled to a smaller category reflecting solely the engagement letters and the work papers of E & Y.[25] Defendants complain the demand for disclosure of E & Y's engagement letters and work papers is untimely and, furthermore, these documents are shielded by the work product doctrine. *See supra* Part III.B. Expert disclosure requirements, the work product protection, and their respective statutory underpinnings, are, on their face, inimical, if not inconsistent, to each other. Rather than being a harmonious thread between these rules, their statutory intents appear to collide. Because of this conflict, the courts have sharply disagreed on the extent to which expert disclosure will reveal that which normally would be shielded by work product doctrine. And as we know, the work product doctrine is a virtual omnipresent pre-trial doctrine to protect an attorney's strategy, mental impressions, and opinions from being disclosed. *Upjohn Co. v. United States,* 449 U.S. 383, 400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *see supra* Part III.B.

FED. R. CIV. P. 26(a)(2) is rather specific on what expert information has to be disclosed and when. Once the expert who will be testifying has been selected, within the time frame provided, the disclosing party must, *inter alia,* identify the expert and provide the expert's curriculum vitae. FED. R. CIV. P. 26(a)(2)(A) & (C). Additionally,

> [e]xcept as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; **the data or other information considered by the witness in forming the opinions;** any exhibits to be used as a summary of or support for the opinions;

sure is indicative of the inhospitable and uncivil course of this litigation which this Court has continuously noted. We strongly suspect that Perla's deposition, which occurred six days after the discovery deadline, was due mostly to a mutual agreement by the parties for the mutual convenience of all. We also know that an expert's deposition cannot occur until all reports have been exchanged, and invariably the last stage of discovery will be consumed with these types of depositions. Thus, piously grandstanding on such technical ceremony that Plaintiffs' request for these documents was six days late is without merit. When this scenario is placed in proper context and perspective, it is the Defendants who created or at least contributed to the Catch–22 on this disclosure. First, they would not reveal this information prior to Perla's report, notwithstanding Plaintiffs' demands for such, because they claimed these documents were protected by the work product doctrine. Dkt. No. 292 at pp. 9 & 10, n.10, 11, & 13. Next, they did not reveal these documents as a part of their required expert disclosure prior to the deposition, which they should have. Now, and the Court is assuming (in light of the general travails associated with discovery) that they agreed to schedule this deposition after the discovery date, Defendants are precluding disclosure of these items because of an untimely request even though they were demanded at the deposition, which, in most instances, would have been a proper moment to make such a demand. Such discovery machinations are clever, but the failure to disclose, on this reason alone, cannot prevail. Since Defendants previously raised the work product doctrine as their reason for not disclosing these documents, the work product doctrine will be the only legitimate defense to disclosure this Court will consider.

**25.** Although this Motion to Compel seeks production of all documents of PMG, for the purpose of this aspect of the Motion, in which we are addressing a very discrete issue, the Court has narrowed the scope of the discussion for clarity sake. Initially however, the Motion to Compel seemed to only address the work papers of E & Y and not D & T. The request for D & T's work papers comes at the last moment in this Motion's process, and there has not been developed for this Court, to the same extent as to E & Y, the identity, the history, and the need for D & T's work papers. The Court has no clue what role D & T plays in this case. Moreover, Defendants represent that Plaintiffs were provided the work papers of D & T. Dkt. No. 292 at p. 11 n.12. Therefore, we are constrained to discuss E & Y's work papers only.

the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED. R. CIV. P. 26(a)(2)(B) (emphasis added).

It is apparent that at this disclosure stage, the disclosing party is obligated to reveal any and all of the data or information **considered** by the expert in forming his or her opinion. The statutory language is rather precise. Rule 26(a)(2)(B) does not state "relied," but "considered." *See Mfg. Admin. and Mgmt. Sys., Inc. v. ICT Group, Inc.*, 212 F.R.D. 110, 115 (E.D.N.Y.2002). But what are we to make of this direction if the data or information to be considered is also cloaked with the work product doctrine, codified in FED. R. CIV. P. 26(b)(3), that being that tangible things prepared in anticipation of litigation or trial should not be revealed unless there is a showing of a substantial need and undue hardship in obtaining a substantial equivalent thereof! Since both of these requirements cannot possibly mesh, and a stalemate between these two rules cannot continue, should not one discovery rule control the other?

There has been a long and arduous history plaguing this dilemma. Divergent views as to which one of the Federal Rules should control under these circumstances are plentiful. Some courts have opted for a bright line rule, one way or the other. *See Baum v. Village of Chittenango*, 218 F.R.D. 36 (N.D.N.Y.2003); *Mfg. Admin. and Mgmt. Sys., Inc.*, 212 F.R.D. 110 (survey of cases);[26] *B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of New York Inc.*, 171 F.R.D. 57, 63 (S.D.N.Y.1997). Other courts have ameliorated the strictness of such a definitive rule. *Magee v. Paul Revere Life Ins. Co.*, 172

F.R.D. 627, 642–43 (S.D.N.Y.1997). But if we turn to, or at least start our analysis with, the Rule Advisory Committee for guidance as to what data is to be disclosed with an expert's report, the basis for a bright line rule becomes evermore evident:

> The report is to disclose the data and other information **considered** by the expert and any exhibits or charts that summarize or support the expert's opinion. Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinion—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

FED. R. CIV. P. 26(a)(2)(B) advisory committee notes 1993 amend (emphasis added).

For a host of reasons, particularly overall functionality, predictability, litigation certainty, truth seeking, and eventual testimonial use, this Court embraces those precedents that support the bright line rule that expert disclosure of all data and information **considered** by the expert should be disclosed notwithstanding the presence of work product consideration.[27] Indeed, we agree with the reasons postulated in support of a bright line rule of disclosure especially in light of modern day litigation practice, namely:

> the attorney-client expert dynamics in the litigation context, including effective cross-examination; the efficiency of the truth-finding process; and the maintenance of the integrity of the work-product doctrine fostered by a simple attorney decision not to share such material with the expert; . . . . foster[ing] the pre-trial goals of narrowing the issues, avoiding surprise, and dispensing with needless depositions.

*Baum v. Village of Chittenango*, 218 F.R.D. at 40 (citing, *inter alia, Mfg. Admin. and Mgmt. Sys., Inc.*, 212 F.R.D. at 115–17).

---

**26.** For a more complete and cogent analysis in support of a bright line rule which favors full disclosure, including work product documents, the Court invites the reader to District Judge Young's decision and order in *Mfg. Admin. and Mgmt. Sys., Inc.*, 212 F.R.D. 110 and Magistrate Judge Sharpe's decision and order in *Baum v. Chittenango*, 218 F.R.D. 36.

**27.** We are addressing only the auditing work papers and engagement letters, and "not core attorney work product" which comprise mental impressions, strategies and opinions. However, if we were, this Decision and Order would be controlling nonetheless.

█ Accepting this bright line rule does not abandon or eviscerate the work product doctrine, particularly "core work product," in the least. If an attorney's impressions and theories of the case are considered by the expert, they too should be revealed. The salvable and cautionary corollary to this rule for attorneys is to be discrete and circumspect in what work product is shared with expert who will be testifying. *Baum v. Chittenango*, 218 F.R.D. at 40; *Mfg. Admin. and Mgmt. Sys., Inc.*, 212 F.R.D. at 117 ("To escape the wide swath of discovery's net, therefore, an attorney can simply choose not to communicate such work product to a testifying expert.").

Applying this bright line rule to the facts of this case, it is clear that the Defendants have to disclose the engagement letters and E & Y's work papers. Mr. Perla, who participated in the audit process, reviewed the work papers, and specifically referred to the work papers in his expert report, surely considered the data and information contained therein. Since, we are adopting the rule which demands full disclosure of all data and information considered by an expert, notwithstanding the interjection of an attorney's deliberative imprimatur over the data and information, E & Y's work papers will be disclosed to Plaintiffs. The Court certainly would have arrived at the same conclusion nonetheless even if it did not adopt this bright line rule, and, rather, accepted the lesser intrusion into the work product protection, which requires revealing only the **factual** data and information. *Magee v. Paul Revere*, 172 F.R.D. at 642–43. It is a safe assumption that the work papers contain mostly facts garnered through the audit process, and therefore, would be subject to complete discovery nonetheless. *Id.*

█ As to the Lugosch Audit Papers, this Court is uncertain if Defendants' expert reviewed these documents in rendering his opinion. If in fact Mr. Perla reviewed or considered these papers, the above ruling will encompass the Lugosch Audit Papers as well, and must be similarly disclosed to the Plaintiff. If Perla did not review them then disclosure is not warranted. And, not to avoid the issue of D & T's audit papers (*see* n.25), if Perla reviewed and considered these work papers, as well, in arriving at his opinion, they too must be disclosed.[28]

**8. Remainder of Privilege Log, dated December 20, 2002 (Dkt. No. 295, Ex 1)**

There are many documents listed on this log that elude neat discrete group identities so that the Court can address the privilege issue as it has done with those discussed above. Nonetheless the Court has reviewed this privilege log and determines that there are no waivers for many, if not all, of these remaining documents, unless already indicated above as being waived or shared pursuant to the non-waiver agreement. *See supra* n. 18 & 22; Part III.E.1 (Lugosch Audit Papers); Part III.E.2 (Bonwit Teller); Part III.E.3 (Chase Loan); Part III.E.4 (Recapitalization Project and Equity Consideration). Many of these documents concern preparation for anticipated litigation or seeking other legal advice. Therefore, the following documents remain confidential: 6–11, 26–33, 36, 49–51, 53–59, 61–64, 66, 76–85, 89–90, 93, 109–20, 128–31, 133, 136, 138–42, 144–47, 149–51, 155, 161–74, 179–80, 193–97, 200–05, 208–09, 211–15, & 217–18.

**9. Remainder of the Supplemental Privilege Log, dated September 11, 2003 (Dkt. No. 295, Ex. 3)**

There are a host of documents with multifaceted purposes to such an extent that the Court cannot expeditiously categorize them as done above. The Court has cautiously scrutinized this log and can state that there

---

**28.** A PMG's principal issued a memorandum that may provide an additional basis for the disclosure of relevant financial statements relevant to Plaintiffs' Partnerships. Dkt. No. 292, Ex. K (Viggiano Memo). This memorandum reveals that there are financial statements required by "Lender," presumably a bank or financial institution. If indeed financial statements were prepared and shared with a Lender, who would be a third-party, and relate to Plaintiffs' Partnerships, they should be disclosed. Much like this Court's previous Order directing the disclosure of Chase Manhattan Loan documents, financial statements shared with a third-party constitute a waiver of any privilege and thus should be shared with Plaintiffs, if they have not already. *See supra* Part III.E.3.

are no waivers of the privileges present nor any other reason which would compel disclosure. The Defendants have substantiated their claims of attorney-client privilege and work product for the following designated items: 23–25, 28–40, 45–54, 56–163, & 165–202.

 To the contrary, the documents designated 26 & 27, pertaining to Independence Mall's refinancing, shall be disclosed since Plaintiff Bersani is a partner in this Mall, and his other partners, even though they may be Defendants, have seen these documents, know their content and ramifications, and have a fiduciary obligation to share them with him. With regard to the document designated 55, this is a letter from Plaintiffs' counsel to one of the Defendants' counsel. Unless there are some handwritten mental impressions noted thereon, this document shall be disclosed. As to the document designated 164, it appears to be a letter from Defendant Congel to KeyCorp Leasing, which, in essence, authorizes the disbursement of loan proceeds. This document was shared with Plaintiffs pursuant to the non-waiver agreement in redacted form. If the redactions are attorney's notes, which may constitute advice to Congel or work product, then the redacted document shall remain as is. However, if the redactions are not of the sort, then it appears that this disclosure to a third party waived any privileges and shall be disclosed.

### 10. Privilege Log, dated August 12, 2003 (Dkt. No. 295, Ex. 4)

This entire log has been discussed above. *See supra* Part III.E.2 (Bonwit Teller).

### 11. Redacted Log (Dkt. No. 295, Ex. 2).

Redacted documents that touch on the many subject areas discussed above were disclosed to Plaintiffs under the non-waiver agreement. Plaintiffs seeks all of these documents in an unredacted form. Consistent with the rulings above, the Court will not direct the Defendants to provide these documents to Plaintiffs in a format other than what has already been disclosed.

### 12. PCK "Agreed Upon Procedures" Report

Plaintiffs seek the draft copy of this PCK Report and Marc Malfitano's cover letter dated August 22, 2000. Defendants declare that the draft copy of the PCK Report has already been disclosed and only the Malfitano letter was withheld. Dkt. No. 292 at p. 9; Dkt. No. 294 at ¶ 11. If they did not disclose this report earlier, they surely have done so in attaching it as an exhibit to their memorandum. Dkt. No. 294, Ex. K.

Defendants still contend that the Malfitano letter is shielded by the attorney-client privilege in that Malfitano, PMG's General Counsel, was seeking advice from outside counsel. The letter in question was submitted to this court for an *in camera* review, and such review confirms that the letter was addressed to outside counsel and indeed Malfitano was seeking legal advice on whether outside counsel agreed with his recommendation on addressing matters with the auditors. Even though this letter inadvertently fell into the possession of Plaintiffs' counsel, this does not actuate a waiver. Therefore, this letter shall remain confidential.

## IV. CONCLUSION

Based upon all of the foregoing, in sum, the Defendants sustained, for the most part, their burden of establishing the attorney-client privilege and work product doctrine over a grand expand of documents. However, there are several instances where they have failed to meet this burden and groups of documents will have to be disclosed, particularly the audit papers, and possibly the Lugosch Audit Papers. The parties are to be guided accordingly.

Thus, except where specifically noted above or already shared pursuant to the non-waiver agreement, Plaintiffs have failed to persuade the Court to grant disclosure of the following:

1. All documents listed on the Privilege Logs withheld on the basis of privilege, particularly

 (a) The Bonwit Teller series of documents

 (b) The Chase Loan or LOC

 (c) Equity Consolidation

(d) Berkshire Refinancing

(e) PCK Report Cover Letter;

2. All documents listed on the Privilege Logs redacted on the basis of privilege;

3. Unredacted copies of all redacted documents that are not listed on the Privilege Logs;

4. All documents and information provided by PMG to the Defendants; and

5. Depositions or continuation of Defendants and other authors and recipients on the above documents.

With regard to those documents required to be disclosed, Defendants shall serve those documents upon Plaintiffs within twenty (20) days of the receipt of this Memorandum–Decision and Order.

Further, affidavits, declarations, and exhibits which were submitted to this Court under seal shall remain as such when docketed by the Clerk of the Court.

SO ORDERED.